NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Grafton
No. 2014-0739

SIGNAL AVIATION SERVICES, INC.

v.

CITY OF LEBANON

Argued: January 7, 2016
Opinion Issued: June 28, 2016

Law Office of Stephen P. Girdwood, PLLC, of Lebanon (Stephen P. Girdwood on the brief and orally), for the plaintiff.

Gardner Fulton & Waugh PLLC, of Lebanon (Adele M. Fulton on the brief and orally), for the defendant.

HICKS, J. The plaintiff, Signal Aviation Services, Inc. (Signal), appeals a ruling of the Superior Court (Bornstein, J.) granting summary judgment in favor of the defendant, City of Lebanon (City), in this action by Signal for, among other things, breach of contract. The City cross-appeals a portion of the trial court's order interpreting the contract. We affirm.

The following facts were recited in the trial court's order, are contained in the record, or are taken from our decision in a prior appeal in this case. See Signal Aviation Servs. v. City of Lebanon, 164 N.H. 578 (2013). Signal leases

8.91 acres at the Lebanon Municipal Airport (airport) as assignee of a Lease and Operating Agreement (LOA).  The City owns the airport and is the lessor under the LOA.  The LOA grants Signal the nonexclusive right and obligation to provide fixed based operator (FBO) services at the airport.  FBO services include "aircraft ground guidance and ramp service, aircraft parking and storage, aircraft maintenance and repair service, flight training, sale and rental of aircraft, flight services and charter operations, and maintenance in operation of facilities for the comfort and convenience of pilots and passengers." (Quotation and ellipsis omitted.)  In granting this nonexclusive right, the City agreed in paragraph 3M(2) of the LOA that "[a]ny other operator of aeronautical endeavors or activities will not be permitted to operate on the Airport under rates, terms [or] conditions which are more favorable than those set forth in this Agreement."

In 2006, the City increased the assessed value of the land leased by Signal, not including the improvements, from $77,400 to $868,300, resulting in a corresponding increase in Signal's property tax liability.  Id. at 580.  Signal applied for an abatement of taxes for the years 2006 and 2007.  Id.  Following denial by the City's assessors, Signal appealed to the New Hampshire Board of Tax and Land Appeals (BTLA).  Id.  The BTLA dismissed the appeals because Signal failed to present evidence of the property's market value.  Id.  Signal did not appeal that decision.  Id.

Signal then brought the instant action claiming, among other things, breach of contract.  Its writ alleged that the City "materially breached its obligations under the [LOA] by providing more favorable and disproportionate tax assessments and taxation schemes under agreements with other entities at the Airport providing commercial aeronautical services there."

The City filed a motion to dismiss, arguing that Signal's exclusive remedy for disproportionate taxation was through the statutory abatement process and, consequently, the trial court lacked jurisdiction to grant the relief sought.  Id. at 581.  The trial court granted the City's motion and Signal appealed.  Id. at 579.

On appeal, we affirmed the trial court's order in part, reversed in part, and remanded for further proceedings.  Id.  We held that "to the extent that Signal's breach of contract claim sought relief from 'disproportionate taxation,' its claim [was] unavailing," as it was, "in effect, a claim for abatement of taxes . . . [which] may be pursued only through the tax abatement statutory scheme."  Id. at 583.  We also held:

> However, to the extent that Signal's breach of contract claim
> sought relief from "unequal treatment," specifically with respect to
> the amount of taxable land the City attributes to Signal and to
> other airport tenants with which the City contracts, Signal may

pursue this claim without complying with the tax abatement statutory process.

Id. at 583-84.

On remand, the City moved for summary judgment on what remained of Signal's breach of contract claim. The trial court noted that Signal's objection specified four tenants, or categories of tenants, that were allegedly taxed disproportionately. First, Signal claimed that Magic Bird Contracting, Inc. (Magic Bird) and Lebanon Hangar Associates, Ltd. (Lebanon Hangar) are taxed more favorably than Signal. Second, Signal argued that tenants at the Executive Ramp, where the City had constructed T-hangars and tie-down spaces "to provide the public with . . . parking spaces for private aircraft," receive more favorable tax treatment. (Quotation omitted.) Third, Signal contended that tenants at the Airport Terminal are taxed disproportionately. Finally, Signal claimed that the City's exemption from taxes constitutes unequal treatment for purposes of paragraph 3M(2).

The trial court granted the City's motion for summary judgment, and Signal now appeals. The City cross-appeals, challenging a portion of the trial court's interpretation of the LOA. On April 21, 2016, we requested supplemental briefing from the parties on the following questions:

With respect to the issue of taxation, do paragraphs 3M(2) and 3D, taken together, ensure only that all operators of aeronautical endeavors or activities permitted to operate on the airport will be required to pay such taxes as are lawfully levied or assessed?

Does the City's operation of the Executive Ramp violate paragraphs 3M(2) and 3D as so construed?

Having received supplemental briefs from both parties, we now resolve the issues before us.

Our standard of review is well-settled:

In reviewing the trial court's rulings on cross-motions for summary judgment, we consider the evidence in the light most favorable to each party in its capacity as the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law. If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment.

3

<u>Granite State Mgmt. & Res. v. City of Concord</u>, 165 N.H. 277, 282 (2013) (quotations and citation omitted).

In addition, this appeal requires us to review the trial court's interpretation of the LOA. Our review is <u>de novo</u> "[b]ecause the proper interpretation of a written agreement is ultimately a question of law for this court." <u>Gen. Linen Servs. v. Franconia Inv. Assocs.</u>, 150 N.H. 595, 597 (2004). We will sustain the trial court's findings and conclusions unless they are lacking in evidentiary support or tainted by error of law. <u>Id</u>. Our standards regarding contract interpretation are also well-established:

> It is axiomatic that we give an agreement the meaning intended by the parties when they wrote it. When interpreting a written agreement, we give the language used by the parties its reasonable meaning, considering the circumstances and context in which the agreement was negotiated, when reading the document as a whole. Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used. Only when the parties reasonably disagree as to its meaning will the agreement's language be deemed ambiguous. If the agreement's language is ambiguous, it must be determined what the parties, under an objective standard, mutually understood the ambiguous language to mean.

<u>Id</u>. (citations omitted).

Signal argues that the trial court erred in: (1) ruling that the City is not an "operator of aeronautical endeavors or activities" for purposes of paragraph 3M(2) of the LOA; (2) ruling that the City has no authority to not assess taxes on the premises leased to Signal; (3) ruling that Signal cannot raise the claims that it has been treated differently with respect to the amount of land attributed to it for taxation as compared to the amount attributed to Lebanon Hangar, Magic Bird, and the tenants at the airport's Airport Terminal; and (4) finding that all airport tenants are taxed for the entire amount of land they lease. In its cross-appeal, the City challenges "the trial court's ruling that paragraph 3M(2) is generally inclusive of the subject of real estate taxation."

Signal first challenges the trial court's conclusion that the City is not an "operator of commercial endeavors or activities" under paragraph 3M(2). (Quotation and underlining omitted.) It argues that the trial court

> failed to recognize that the Lease language in question has its origin in the economic non-discrimination provisions of . . . FAA grant assurances . . . [under which] the City must . . . treat itself as an operator of aeronautical endeavors and not have more

4

favorable terms or conditions than other operators leasing at the Airport when the City is in competition with those operators.

FAA (Federal Aviation Administration) grant assurances are written assurances, given by airport sponsors, such as the City, "as a condition of receiving federal funds for airport improvements," in which the sponsor pledges that it "will make the airport available for public use without unjust discrimination and will subject FBOs who use the airport in a similar manner to the same charges." Gary Jet Center, Inc. v. Gary/Chicago Intern. Airport Authority, No. 2:13-CV-453 JVB, 2014 WL 1329412, at *2 (N.D. Ind. Apr. 2, 2014). Signal cites two provisions of the City's grant assurances dealing with economic nondiscrimination. The first, assurance 22(c), provides that "[e]ach fixed-base operator at the airport shall be subject to the same rates, fees, rentals and other charges as are uniformly applicable to all other fixed-base operators making the same or similar uses of such airport and utilizing the same or similar facilities." The second, assurance 22(g), provides that "[i]n the event the sponsor itself exercises any of the rights and privileges referred to in this assurance, the services involved will be provided on the same conditions as would apply to the furnishing of such services by commercial aeronautical service providers authorized by the sponsor under these provisions." Signal contends that the City, as the airport sponsor, has "provid[ed] aeronautical services at the Airport" in competition with Signal, including, but "not necessarily limited to, the leasing of [hangar], tie-down and operational space."

The City asserts that the definitions of the terms used in paragraph 3M are contained in the Airport Rules promulgated by the City and argues that these definitions are incorporated into the LOA and "control how paragraph 3M is to be construed." The term "Operator," for instance, is defined in the Airport Rules as "any Entity who has applied for and received written permission to engage in a Commercial Activity at or from the Airport, and ha[s] entered into and executed the required Lease/operating agreement with the City." (Underlining omitted.) The City argues, and the trial court agreed, that paragraph 3M(2) cannot be construed to include the City as an "operator" because "doing so would require the City to enter into agreements with itself." Rather, the City contends, "[t]his paragraph can only refer to third parties (private entities besides Signal and the City)."

Although the trial court found that "[t]he parties do not dispute that the Agreement incorporates by reference the City's rules and regulations for the operation of the airport," we are not convinced that such incorporation was so broad as to supply the definitions for the terms used in paragraph 3M.[1]

---

[1] The City notes that the Airport Rules themselves provide that "[t]hese Minimum Standards shall be appended to and considered part of all present and future Lease/operating agreements with the City at the Airport." Nevertheless, the Minimum Standards portion of the Airport Rules does not itself contain the definitions of terms and the City has not directed us to a

5

Paragraph 3E of the LOA obligates <u>Signal</u> to "comply with all federal, state and local laws, rules and regulations which may apply to the conduct of the business contemplated, including rules and regulations promulgated by the City." We do not read this language to unambiguously incorporate the definition of "operator" into a separate provision of the LOA that circumscribes <u>the City's</u> rights.

We agree with Signal, moreover, that the City's FAA assurances are relevant to interpreting the LOA. Paragraph 13 of the LOA provides, in part:

> This Agreement shall be subject and subordinate to the provisions of any existing or future agreement between the City and the United States, or any agency thereof, relative to the operation or maintenance of the Airport, the execution of which has been or may be required as a condition precedent to the expenditure of federal funds for the development or operation of the Airport.

In light of this broader incorporation of the FAA assurances, we decline to affirm the trial court's conclusion that "the City is not an 'operator of aeronautical endeavors or activities' under any reading of [paragraph 3M(2)]; it is simply a lessor of real estate at the Airport." The FAA has defined aeronautical activity as "any activity that involves, makes possible, or is required for the operation of aircraft or that contributes to or is required for the safety of such operations . . . includ[ing] . . . aircraft storage." <u>BMI Salvage Corp. v. F.A.A.</u>, No. 11-12583, 2012 WL 2924025, at **3 (11th Cir. July 19, 2012) (quotation omitted). It is undisputed that the City leases T-hangars and tie-down spaces at the Executive Ramp to private aircraft owners. Thus, we conclude that the City conducts "aeronautical endeavors or activities" at the airport. Accordingly, we cannot conclude that the City is unambiguously excluded as an "operator" under paragraph 3M and, for purposes of this opinion, we assume, without deciding, that the City is an "operator of aeronautical endeavors or activities" under paragraph 3M(2). This assumption is relevant to our ultimate disposition, as set forth below.

Signal next contends that the trial court erred in concluding that the City lacks authority to assess no taxes on the premises it leased to Signal. "The assessment and collection of taxes must be based on legislative authority." <u>N.E. Tel. & Tel. Co. v. City of Rochester</u>, 144 N.H. 118, 120 (1999) (<u>Rochester I</u>). The allocation of the tax burden at issue here is mandated by statute. <u>See id</u>. RSA 72:6 provides that "[a]ll real estate, whether improved or unimproved, shall be taxed except as otherwise provided." RSA 72:6 (2012). City-owned real estate is exempted under RSA 72:23, which provides that the "[l]ands and the buildings and structures thereon and therein . . . owned by . . . a New Hampshire city," RSA 72:23, I(a) (2012), are exempt from taxation unless

factual finding that the Minimum Standards were appended to the LOA.

6

otherwise provided by statute.  RSA 72:23 (2012); see Wooster v. Plymouth, 62 N.H. 193, 209 (1882) (explaining that the property of municipal corporations "is exempted from state taxation, because, like the property of the state, it is public").  RSA 72:23, I(b), in turn, "otherwise provid[es]" with respect to property that a city leases to others:

> All leases and other agreements, the terms of which provide for the use or occupation by others of real or personal property owned by the state or a city, town, school district, or village district, entered into after July 1, 1979, shall provide for the payment of properly assessed real and personal property taxes by the party using or occupying said property no later than the due date.

RSA 72:23, I(b) (emphasis added); see Verizon New England v. City of Rochester, 151 N.H. 263, 266-67 (2004) (Rochester II) (holding that, according to the unambiguous, plain language of RSA 72:23, I(b), "leases and other agreements which permit the use or occupation of public property must provide for the payment of properly assessed real estate taxes"); Rochester I, 144 N.H. at 122 (explaining that leased property excepted, under RSA 72:23, I(b), from RSA 72:23, I(a)'s municipal tax exemption remains taxable under RSA 72:6 and that RSA 72:23, I(b) "simply requires the [municipality] to shift the tax burden imposed by RSA 72:6 to [its lessee] by making tax liability a condition of" the lease).  Accordingly, paragraph 3D of the LOA provides:

> [Signal] shall meet all expenses and payments in connection with the use of the Premises and the rights and privileges herein granted, including taxes, permit fees, license fees and assessments lawfully levied or assessed upon the Premises or property at any time situated therein and thereon.  [Signal] may, however, at its sole expense and cost, contest any tax, fee or assessment.

We have held that "[t]owns have no power to assess any tax not authorized by statute, nor to change or modify the public law regulating taxation."  Mack v. Jones, 21 N.H. 393, 395 (1850).  Thus, in Piper v. Meredith, 83 N.H. 107 (1927), we held that even if the plaintiff could prove that the town contracted with the plaintiff's predecessor in interest that he "and his successors should occupy the premises forever without the payment of taxes," it "would not entitle [the plaintiff] to the relief for which he prays in this petition, i.e., that the tax assessed against him be abated."  Piper, 83 N.H. at 112, 113 (quotation omitted).  We concluded that "[t]he contract, if proved, would be illegal and void, for a town cannot, by grant or stipulation in a conveyance, exempt land from taxation."  Id. at 113.  In accordance with these precedents, we agree with the trial court that the City has no power to contract with Signal not to tax the leased property.  See id.

Signal nevertheless argues that "[w]hether or not the City has legal authority to enter into a contract to not tax land, that is what the City did." It cites Lebanon Hangar Associates, Ltd. v. City of Lebanon, No. 215-2007-EQ-0025 (N.H. Super. Ct. Mar. 7, 2013), which we affirmed by unpublished order, Lebanon Hangar Associates, Ltd. v. City of Lebanon, No. 2013-0319 (N.H. Apr. 17, 2014). Lebanon Hangar Associates involved an arbitrator's decision reforming a lease at the Lebanon Airport. Lebanon Hangar Assocs. v. City of Lebanon, 163 N.H. 670, 672 (2012). The arbitrator concluded that Lebanon Hangar "is not and has not been obligated to pay real estate taxes to the City under the lease." Id. (quotation omitted). We noted that "[t]he evidence of the parties' intentions upon which the arbitrator could have relied" consisted in part of "two letters, exchanged between the parties around the time of the execution of the lease, expressing both parties' expectation that taxes would be assessed on the leased building and structures on the land, but not on the City-owned land itself." Lebanon Hangar Associates, No. 2013-0319, at 3.

The arbitrator considered purportedly conflicting case law in New Hampshire on the subject of taxation of property leased by a municipality; namely, Appeal of Reid, 143 N.H. 246 (1998), on the one hand, and Rochester I, Rochester II, and Verizon New England v. City of Rochester, 156 N.H. 624 (2007), on the other. See Lebanon Hangar Associates, No. 2013-0319, at 5-6. We declined to resolve the purported conflict; rather, under the standard of review applicable to arbitrators' awards, see RSA 542:8 (2007), we determined that we could not "conclude that the arbitrator committed 'plain mistake' in holding that RSA 72:23, I(b) 'does not prevent reformation of a lease such that the lessee is not required to pay taxes on the leased land.'" Lebanon Hangar Associates, No. 2013-0319, at 6; see Masse v. Commercial Union Ins. Co., 136 N.H. 628, 632 (1993) (noting that "RSA 542:8 allows the superior court to alter an arbitrator's decision only for 'plain mistake,' or to vacate it for 'fraud, corruption, or misconduct'"). Accordingly, in addition to being a non-precedential, unpublished decision, Lebanon Hangar Associates is distinguishable on the basis of its procedural posture and the deferential standard of review we applied.

In any event, we do not find Reid incompatible with our subsequent case law. In Reid, we "look[ed] to the plain meaning of RSA 72:23, I,[2] and conclude[d] that in order for leaseholds for a term of years to be taxable under RSA 72:23, the lease agreement with the town must include a provision for the payment of property taxes." Reid, 143 N.H. at 252. We determined that the

---

[2] We noted in Reid that RSA 72:23, I, had been amended several times during the period in which "the petitioners' individual leases were signed" and that, therefore, "different versions of the statute appl[ied]." Reid, 143 N.H. at 250. We further noted, however, that, in general, "the pertinent provisions in effect for each lease did not differ in any significant manner." Id. at 251. Similarly, amendments to the statute subsequent to Reid are immaterial to our analysis here. See RSA 72:23, I (1991) (amended 1993, 1999, 2002, 2003, 2006, 2011).

leaseholds at issue were not taxable because "the leases d[id] not include the tax provision required by RSA 72:23, I." Id. at 253.

"[C]aution[ing] against imputing too much weight to comments of proponents of bills offered in legislative committee hearings," we "reject[ed] the town's argument that committee notes of comments made by the bill's proponents regarding a 1979 amendment to the statute demonstrate that RSA 72:23 requires lessees of public property to be taxed on their leasehold interests." Id. (emphasis added) (quotation omitted); cf. Rochester II, 151 N.H. at 266-67 (interpreting the plain language of RSA 72:23, I(b)). To the extent that language could be read as being inconsistent with our treatment of RSA 72:23 in Rochester I, Rochester II, and Verizon New England, we note that the Reid language is dicta. We concluded the discussion of that argument by stating: "Because the issue is not before us, however, we express no opinion as to the validity of leases that do not include a provision providing for the payment of properly assessed taxes as required by the enforcement provision of RSA 72:23, I(b)." Reid, 143 N.H. at 253. Here, the LOA contained a provision — paragraph 3D — that required Signal to pay all lawfully levied or assessed taxes. Thus Reid is inapposite to the case before us.

As noted previously, a contract that purports to exempt taxable land from taxation "would be illegal and void." Piper, 83 N.H. at 113. We therefore decline to construe paragraph 3M(2) to require the City to not tax Signal on the leased premises and, accordingly, we reject Signal's second claim of error. We are aware of a line of cases indicating that a municipality could contract to reimburse its lessee for taxes paid. See Hampton v. Hampton Beach Improvement Co., 107 N.H. 89, 99 (1966) (stating that while "[t]he town could not lawfully exempt [leased] real estate from taxation . . . [it] could validly contract with the lessee to pay any taxes as a consideration for the lessee's undertakings in the lease"); Hampton etc. Co. v. Hampton, 77 N.H. 373, 374 (1914) (same); cf. Town of Ossipee v. Whittier Lifts Trust, 149 N.H. 679, 686 (2003) (concluding that license for use of state-owned communications tower provided "that the State would reimburse Whittier Communications for any taxes it pays relating to its use of the tower"). As the LOA here contains no such provision, however, that line of cases is also inapposite. Moreover, we express no opinion as to whether the City could include such a provision in airport leases subject to its FAA assurances.

Signal next challenges the trial court's ruling that Signal could not proceed on its claims that it has been treated differently with respect to the amount of taxable land attributed to it as compared to the amounts attributed to Magic Bird, Lebanon Hangar, and the tenants at the airport's Airport Terminal. The court ruled that Signal had not raised these claims in its original pleadings and could not raise them for the first time on summary judgment.

9

Pleadings are construed liberally in this jurisdiction. See Robbins v. Seekamp, 122 N.H. 318, 322 (1982). "Pleadings ought to be simple, concise and indicate the theory on which the plaintiff is proceeding so that the opposing party can adequately defend." Morency v. Plourde, 96 N.H. 344, 345-46 (1950).

We conclude that the trial court did not err in granting summary judgment to the City on Signal's claims related to the Airport Terminal tenants, Magic Bird, and Lebanon Hangar because we agree with the City that "Signal never alleged a breach with respect to the amount of taxable land attributed to any tenants except in relation to those at the Executive Ramp."

Signal's writ alleged:

30. Signal is obligated to pay taxes on a large portion of the airport property, even though a significant portion of the taxed lot is undeveloped or open for public use and access.

31. The method used by the City to attribute taxable land to tenants at the Executive Ramp leaves a significant portion of the land comprising the Executive Ramp untaxed and amounts to different terms and conditions for tenants there as opposed to the terms and condition[s] under which Signal operates at the Airport, as well as providing the City with a competitive advantage over Signal.

(Emphases added.) There appears to be no dispute that the Airport Terminal tenants, Magic Bird, and Lebanon Hangar are not tenants at the Executive Ramp. The deposition testimony of Signal's prior vice president and chief operating officer indicates that the Airport Terminal is at the West Ramp and that Lebanon Hangar is located at the South Ramp. Magic Bird's location is not evident in the record, but Signal's answers to interrogatories state that the City began leasing space at its newly-constructed Executive Ramp in 2008 — two years after Signal alleges that the City taxed Magic Bird's leased land at zero dollars. Accordingly, there appears to be no genuine dispute of material fact as to the location of each of these tenants outside the Executive Ramp. Because Signal's allegations regarding disparate attribution of taxable land apply only to tenants at the Executive Ramp, the trial court did not err in granting summary judgment to the City on Signal's claims as to the Airport Terminal tenants, Magic Bird, and Lebanon Hangar.[3]

---

[3] The trial court granted the City summary judgment on Signal's claims with respect to the Executive Ramp tenants on the basis that "the Executive Ramp tenants are not commercial operators of aeronautical endeavors or activities but are simply lessees of parking spaces" and therefore "do not fall within the purview of paragraph 3M(2)." Signal has not appealed that ruling.

Signal nevertheless argues that the trial court construed Signal's claims too narrowly and failed to incorporate prior allegations into its contract claim. Signal contends that its factual allegations were "just specific enough to support each underlying claim" and that it purposefully "referred to tenants in a general context" so as "to be inclusive of all tenants providing commercial aeronautical services and the City itself." Thus, Signal's breach of contract claim alleged that "[t]he City has materially breached its obligations under the [LOA] by providing more favorable and disproportionate tax assessments and taxation schemes under agreements with other entities at the Airport providing commercial aeronautical services there." Signal argues that the tenants at the Airport Terminal, as well as Magic Bird and Lebanon Hangar, "fit the defined class of 'other entities at the Airport providing commercial aeronautical services there.'" It contends that its argument is stronger with respect to Magic Bird and Lebanon Hangar because more specific allegations concerning them were incorporated by reference into its contract claim. Signal argues that the trial court erred by "unfairly and inappropriately . . . associat[ing] those allegations with individual tax claims dismissed earlier by the Court."

Signal's writ alleged:

22. . . . Magic Bird . . . was <u>assessed</u> $0 (zero dollars) for the land upon which its improvements were constructed.

23. . . . Lebanon [Hangar] . . . was <u>assessed</u> at $283,000 for the 4.6 acres of leased land upon which its improvements were constructed (approximately $61,000/acre).

    . . . .

26. The leased land for each of [Signal's, Magic Bird's, and Lebanon Hangar's] described parcels is similar in location, available and permitted use, and airport access, and should all be <u>assessed</u> at relatively the same value per acre.

(Emphases added.) We agree with the City and the trial court that these allegations relate to Signal's claim, which we held to be "unavailing," <u>Signal Aviation Servs.</u>, 164 N.H. at 583, that it "was being <u>disproportionately assessed</u> as compared to other entities operating and leasing land at the Airport." We find no indication in the above allegations, or in any others in Signal's writ, that Signal claimed disproportionate attribution of taxable land to it as compared with such attributions to Magic Bird and Lebanon Hangar.

Furthermore, although pleadings are liberally construed in this jurisdiction, <u>Robbins</u>, 122 N.H. at 322, "[t]he defendant is entitled to be informed of the theory on which the plaintiffs are proceeding." <u>Morency</u>, 96 N.H. at 346. We cannot conclude that a claim alleging "more favorable and

disproportionate tax assessments and taxation schemes under agreements with other entities at the Airport providing commercial aeronautical services there" adequately informed the City that Signal sought to proceed on a theory of disproportionate attribution of taxable land with respect to the Airport Terminal tenants, Magic Bird, and Lebanon Hangar. Accordingly, we affirm the trial court's grant of summary judgment to the City on these claims.

Signal next challenges the trial court's conclusion that all tenants at the airport, including the Airport Terminal tenants, Magic Bird, and Lebanon Hangar, are, like Signal, "taxed for the entire amount of land or space that each such tenant leases." This conclusion was an alternative ground for granting summary judgment to the City "even if Signal could now present its unequal treatment claims concerning [Lebanon Hangar], Magic Bird, and the Airport Terminal tenants at this late date." Because we have affirmed the trial court's ruling that Signal could not first raise these claims at the summary judgment stage, we decline to address the court's alternative ruling.

We now turn to the City's cross-appeal. The trial court rejected the City's argument that paragraph 3M(2) of the LOA "applies only to the 'operating terms and conditions at the airport' and not 'to the subject of taxes.'" Noting that the provision contains no "limiting or qualifying language" that would restrict its scope, the court ruled:

> [T]he plain and unambiguous language of the provision applies generally to all rates, terms and conditions, including the subject of real estate taxation. This interpretation is consistent with the purpose of the provision, which is to ensure that Signal may operate on a level playing field with respect to any competing "operators." The extent of Signal's tax burden directly affects the topography of Signal's playing field vis-à-vis any other "operators of aeronautical endeavors or activities" at the Airport.

We agree with the trial court that inclusion of taxation is consistent with paragraph 3M's purpose to assure Signal a level playing field with respect to other operators of aeronautical endeavors or activities at the airport. The City argues, however, that "the trial court overlooked the very nature and purpose of that paragraph within its context, particularly when paragraph 3D specifically addresses taxes consistent with State law." It first asserts that paragraph 3M is "governed and defined" by the Airport Rules "regarding how, and in what manner, commercial operations at the Airport can be performed." It again contends that the Airport Rules "are the source of definitions for the terms found in the paragraph and [are] clearly incorporated by reference."

We have expressed reservation as to whether the LOA incorporates the definitions contained in the Airport Rules. In any event, the City's argument is based not upon what is contained in the Airport Rules, but rather, what is not.

12

The City notes that the topic of taxation is never mentioned in the Airport Rules. "The scope, nature and purpose of the Rules evince no intent to address that subject, which is not surprising," the City argues, because the rules grant the "authority to manage the Airport and all operations therein and thereon" to the Airport Manager, who "would have no authority to adjust, negotiate, waive, assess or enforce taxes with respect to any tenancy at the Airport." The latter authority, the City asserts, lies with the board of assessors. The City then contends that paragraph 3M should be interpreted in light of this legal framework, in which taxes are dealt with under a statutory scheme wholly separate from the regulation of aeronautical operations at the airport.

Failure to keep these regulatory domains separate, the City argues, "creates a conflicting scheme between tax and contract laws that could generate many inequities between tenants at the Airport and elsewhere." For example, the City argues:

> [If paragraph 3M] applies to taxes, at what point is one tenant's real estate tax a "rate, term or condition" that is more favorable than another's? . . . Well-settled tax law provides a remedy for disproportionate taxation when one taxpayer's assessment is compared to the general level of assessment in the entire community. However, if paragraph 3M(2) is inclusive of taxes, one taxpayer's assessment could be compared unfavorably to just one other tenant at the Airport and allegations of breach could be leveled, and then the appropriate remedy could come into conflict with State law.

(Citation omitted.)

We perceive no such conflict. Paragraph 3M(2) provides that no "other operator of aeronautical endeavors or activities will . . . be permitted to operate on the Airport under rates, terms [or] conditions which are more favorable <u>than those set forth in</u>" the LOA. (Emphasis added.) No tax "rate" is set forth in the LOA. The only "term[]" or "condition[]" in the LOA that deals with taxation is paragraph 3D, which requires Signal to "meet all expenses and payments in connection with the use of the Premises and the rights and privileges herein granted, including <u>taxes</u>, permit fees, license fees and assessments <u>lawfully levied or assessed</u> upon the Premises or property at any time situated therein and thereon." (Emphases added.) Thus, with respect to taxation, paragraph 3M(2) merely obligates the City to require all other operators to pay all lawfully levied or assessed taxes. We note that the City itself asserts that "State tax laws . . . require municipalities to assess all taxpayers (whether a tenant or not) equitably and to treat all similarly situated taxpayers in a similar manner." Accordingly, we are not persuaded to adopt the City's interpretation of paragraph 3M(2) with respect to taxation and accordingly we deny its cross-appeal.

13

Nevertheless, although we deny the City's cross-appeal, our analysis of the City's arguments, taken to its logical conclusion, also disposes of Signal's appeal. We have concluded that paragraph 3M(2), so far as it concerns taxation, merely obligates the City to require all other operators to pay all lawfully levied or assessed taxes. Because we have assumed, without deciding, that the City is an "operator of aeronautical endeavors or activities" under paragraph 3M(2), we read that paragraph to require the City, as lessor, to ensure that it, as an "other operator," also pays all lawfully levied or assessed taxes. As noted above, however, City-owned property is statutorily exempt from taxation and, thus, no property taxes are "lawfully levied or assessed" against the City. Thus, the City's nonpayment of taxes does not violate paragraph 3M(2). Accordingly, we affirm the trial court's grant of summary judgment to the City. See State v. Cook, 158 N.H. 708, 713 (2009) (noting that "[w]e will not reverse a trial court decision when it reaches the correct result and valid alternative grounds exist to reach that result" (ellipsis omitted)).

Affirmed.

DALIANIS, C.J., and CONBOY and LYNN, JJ., concurred.