NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2017-0318


ATRONIX, INC.

v.

KENNETH MORRIS & a.

Argued: April 12, 2018
Opinion Issued: October 23, 2018


Hinckley, Allen & Snyder, LLP, of Manchester (Christopher H.M. Carter and Kimberly M.R. Sullivan on the brief, and Mr. Carter orally), for the plaintiff.


Devine, Millimet & Branch, P.A., of Manchester (Jonathan M. Shirley on the joint brief and orally), for defendant Scott Electronics, Inc.


Daniel R. Tenczar, of Tyngsborough, Massachusetts, on the joint brief, and Law Office of Brian W. Leahey, P.C., of Tyngsborough, Massachusetts (Brian W. Leahey on the joint brief and orally), for defendant Kenneth Morris.


HICKS, J. The plaintiff, Atronix, Inc., which brought this action for, among other things, breach of contract against defendant Kenneth Morris and tortious interference with contractual relations against defendant Scott

Electronics, Inc. (Scott), appeals a decision of the Superior Court (Wageling, J.) dismissing its action for lack of standing. We reverse and remand.

The following facts were recited in the trial court's orders. Morris started working at Atronix Sales, Inc. (Old Atronix) in 1982. He was promoted several times over the course of his employment, eventually becoming program manager in the sales department. That position entailed responsibility for the largest and most important of Old Atronix's accounts. Accordingly, in 1997, Morris was required to sign a non-compete and non-solicitation agreement (the non-compete agreement), and a non-disclosure agreement (collectively, the Agreements).

In 2011, Old Atronix merged with Atronix, Inc. (the Company). In 2014, the Company entered into an Asset purchase agreement (the APA) with Consolidated Cable Assembly Holdings, Inc. (CCAH). Pursuant to the APA, the Company sold its assets, including the tradename "Atronix, Inc.," to a subsidiary of CCAH. The subsidiary, doing business under the name Atronix, Inc., is the plaintiff here.

In 2016, Morris left his job with the plaintiff and was hired as a general manager by Scott, a competitor of the plaintiff. Thereafter, the plaintiff filed the instant suit, alleging breach of contract, tortious interference with contract, and violation of the New Hampshire Consumer Protection Act, see RSA ch. 358-A (2009 & Supp. 2017), and seeking a declaratory judgment and injunctive relief. The defendants moved to dismiss, asserting that the plaintiff lacked standing to enforce the Agreements. The trial court granted the motion, and denied the plaintiff's subsequent motion for reconsideration.

On appeal, the plaintiff argues that: (1) the trial court's decision conflicts with the APA's plain terms; (2) the trial court's decision "also conflicts with the well-established rule that when a business is sold as a going concern under an asset purchase, restrictive covenants are assigned to the buyer along with goodwill and other assets necessary to the continued operation of that business"; (3) the trial court "conflated the issue of whether the non-compete agreement was assigned under the APA, with the wholly separate issue of whether Morris consented to the assignment"; and (4) consent by Morris was not required in any event.

Because the underlying facts relevant to this appeal are undisputed, we review the trial court's ruling that the plaintiff lacks standing to enforce the non-compete agreement de novo. See In the Matter of P.B. & T.W., 167 N.H. 627, 629 (2015). The trial court's decision on that issue was based, in its words, on "[w]hether the terms of the APA transferred the right to enforce the Agreements." We note that the trial court's order, by using the term "Agreements" — which it defined to refer collectively to the non-compete agreement and non-disclosure agreement — broadly rules that neither

agreement was transferred under the APA. The plaintiff, however, challenges only the court's ruling with respect to the non-compete agreement. Accordingly, we decide only the narrow issue of whether the non-compete agreement was transferred to the plaintiff under the APA.

Determining what the APA conveyed requires us to interpret that agreement. We note that although the APA provides that it is to be governed by Delaware law, Delaware's law regarding contract interpretation does not differ materially from our own. Compare Signal Aviation Servs. v. City of Lebanon, 169 N.H. 162, 166 (2016), with Exelon Generation Acquis. v. Deere & Co., 176 A.3d 1262, 1266-67 (Del. 2017), and GMG Capital Inv. v. Athenian Venture, 36 A.3d 776, 779, 783-84 (Del. 2012).

> It is axiomatic that we give an agreement the meaning intended by the parties when they wrote it. When interpreting a written agreement, we give the language used by the parties its reasonable meaning, considering the circumstances and context in which the agreement was negotiated, when reading the document as a whole. Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used. Only when the parties reasonably disagree as to its meaning will the agreement's language be deemed ambiguous. If the agreement's language is ambiguous, it must be determined what the parties, under an objective standard, mutually understood the ambiguous language to mean.

Signal Aviation Servs., 169 N.H. at 166 (quotation omitted); see also Exelon Generation Acquis., 176 A.3d at 1266-67; GMG Capital Inv., 36 A.3d at 779, 783-84.

The plaintiff first argues that the trial court's conclusion that the plaintiff did not acquire Morris's non-compete agreement conflicts with the APA's express terms. In relevant part, Section 2.02 of the APA broadly provides:

> (a) Upon the terms and subject to the conditions of this Agreement, at the Closing, the Company shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to [the plaintiff], and [the plaintiff] shall purchase from the Company, all the assets, properties, goodwill and business of every kind and description and wherever located, whether tangible or intangible, real, personal or mixed, directly or indirectly owned by the Company or to which it is directly or indirectly entitled and, in any case belonging to or used or intended to be used in the Business, other than the Excluded Assets . . . , including the following:

3

(i) the Business as a going concern;

. . .

(viii) all goodwill of the Company;

. . .

(xii) all rights of the Company under all Material Contracts listed in Section 3.16 of the Disclosure Schedule, all other contracts, licenses, sublicenses, agreements, leases, commitments, and sales and purchase orders, and under all bids and offers related to the Business;

. . .

(xiv) all the Company's right, title and interest at the Closing in, to and under all other assets, rights and claims of every kind and nature.

The trial court concluded that the plaintiff lacked standing to enforce the Agreements because "[t]he purchasing of [the Company's] assets, absent an explicit transfer of Morris' Agreements, does not make Plaintiff a contracting party with Morris." The plaintiff counters that Morris's non-compete agreement was included within the phrase "all other contracts . . . [and] agreements" as used in section 2.02(a)(xii). See Beta LaserMike, Inc. v. Swinchatt, No. 18059, 2000 WL 262628, at *1, *3-4 (Ohio Ct. App. Mar. 10, 2000) (rejecting argument that employee confidentiality contracts were not assigned by an asset purchase agreement that failed to list them because, in part, "[t]he Asset Purchase Agreement clearly states . . . that all of the contracts [seller] used in its business were being transferred to [buyer]").

As the plaintiff argues, "Morris' non-compete agreement with [the Company] is clearly a 'contract' or 'agreement' belonging to [the Company]." As such, the plaintiff asserts, it was conveyed to the plaintiff "by the clear terms of the APA." The defendants disagree with that conclusion, arguing that it "ignores basic rules of contract interpretation and relies on stray references and general clauses as proof of an assignment."

The defendants first assert that the APA contains no reference to employee contracts in general, and no specific reference to Morris's non-compete agreement. Rather, they note, the APA contemplated that the plaintiff would offer employment to the Company's employees on the same terms and conditions as in effect at the time of closing. In addition, Article V of the APA contains a non-compete provision, but it does not name Morris.

4

Based on the foregoing, the defendants analogize this case to Hedgeye Risk Management, LLC v. Heldman, 196 F. Supp. 3d 40 (D.D.C. 2016), in which a company (Hedgeye) that had purchased the assets of another firm (PRG) sought to enforce against one of PRG's former employees (Heldman) certain restrictive covenants contained in Heldman's employment contract with PRG. Hedgeye, 196 F. Supp. 3d at 42. Hedgeye asserted that it had acquired Heldman's contract when it purchased PRG's assets. Id. The court disagreed, noting that Heldman's contract was neither included among the scheduled assets nor otherwise referenced in the APA. Id. at 44, 49. Moreover, the court reasoned, "[t]he fact that the APA explicitly provides that Hedgeye could offer employment to PRG employees, and that those employees might then either accept or reject such an 'offer,' is squarely at odds with Hedgeye's contention that PRG's existing employment contracts conveyed to Hedgeye as 'assets' of PRG." Id. at 50. Finally, the court noted that the APA "expressly addresse[d] 'non-competition,'" but rather than mentioning Heldman, was "limited to PRG and its founder." Id.

The defendants contend that, as in Hedgeye, "the language and organization of the APA rebuts any claim that it conveyed the Morris non-compete agreement to Plaintiff as an 'asset' of [the Company]." Finding Hedgeye distinguishable, we disagree.

In Hedgeye, the restrictive covenants were included in Heldman's employment contract. Id. at 42-43. Here, Morris's non-compete and non-solicitation covenants are not contained in an employment contract, but in a written document titled "Atronix Sales, Incorporated Non-compete and Non-solicitation Agreement." (Capitalization and underlining omitted.) Cf. Symphony Diagnostic Services No. 1 v. Greenbaum, 828 F.3d 643, 646 (8th Cir. 2016) (distinguishing case holding that employment contract requiring exclusive service to employer was not assignable without employee's consent on basis that "this case . . . does not involve a personal services contract: it involves free-standing non-compete and confidentiality agreements"). Although "the employment or continued employment of [Morris] by the Company" constituted partial consideration for his covenants, the agreement was also supported by the additional consideration of the Company's payment to Morris of $15.00 per week. The contract contains no other provisions regarding Morris's employment, or the terms and conditions thereof; the only substantive matters dealt with are the prohibitions on competition and the solicitation of the Company's customers and employees. The plaintiff represents that Morris was an at-will employee with no written employment contract and, according to the trial court's recitation of facts, he executed the non-compete agreement approximately fifteen years after commencing employment with Old Atronix.

Because the non-compete agreement at issue here, unlike the contract in Hedgeye, is not an employment contract, the APA provision requiring the plaintiff to "offer employment to each of the then-current employees of the

5

Company upon the same terms and conditions as immediately prior to the Closing" is not inconsistent with the plaintiff's contention that the non-compete agreement was conveyed to the plaintiff under the APA. Cf. Hedgeye, 196 F. Supp. 3d at 49. Arguing to the contrary, the defendants assert that "the APA contemplated Plaintiff entering into a wholly new employment relationship with Morris, untethered from past employment contracts." To conclude, however, that the APA did not convey Morris's non-compete agreement because it "contemplated" the creation of a new employment relationship fails to account for the possibility that Morris could have rejected the offer of employment, and thus, would not enter into new employment and non-compete agreements with the plaintiff.

Morris's non-compete agreement, by its terms, applies "[w]hile the Employee is employed by the Company and for a period of 3 years after the termination or cessation of such employment for any reason." Thus, the non-compete agreement would remain a valuable asset even if Morris had declined employment with the plaintiff and, indeed, would have been all the more necessary in that situation to protect the goodwill conveyed to the plaintiff under the APA. To interpret the term "other contracts" in section 2.02(a)(xii) as not including Morris's non-compete agreement would conflict with the APA's evident intent to convey both the Company's business as a going concern (section 2.02(a)(i)) and all of the Company's goodwill (section 2.02(a)(viii)). See AutoMed Technologies, Inc. v. Eller, 160 F. Supp. 2d 915, 919, 924 (N.D. Ill. 2001) (noting that "the confidential information and good will protected by [employee confidentiality and non-compete] agreements are typically critical components of an asset purchase"). Given that the parties to the APA clearly expressed the intent to convey the business as a going concern, with all of its goodwill intact, we conclude that the term "other contracts" includes the non-compete agreement, which has as its object the protection of the employer's goodwill. See, e.g., Sentry Ins. v. Firnstein, 442 N.E.2d 46, 47 (Mass. App. Ct. 1982).

In light of the foregoing, we also reject the defendants' arguments that the plaintiff's interpretation impermissibly fails to consider the APA as a whole, give effect to all of its provisions, and give specific terms more weight than general ones. Similarly, we reject the defendants' attempt to read significance into the APA's structure. They point out that "[n]ot only does the APA omit any reference to employment contracts in the list of assets transferred under Article II, but it segregates discussion of employee matters to other sections of the agreement." Given, however, that the non-compete agreement is not an employment contract, the APA's treatment of employment matters does not affect our analysis.

Finally, unlike the Hedgeye court, we find it immaterial that the APA failed to mention the employee at issue (there Heldman, here Morris) in the APA's non-compete clause. See Hedgeye, 196 F. Supp. 3d at 50. Courts have

long recognized two distinct sets of circumstances under which non-compete agreements are created: employment and the sale of a business. See, e.g., Hess v. Gebhard & Co., Inc., 808 A.2d 912, 918 (Pa. 2002) (noting that "[i]n Pennsylvania, early distinctions evolved between covenants ancillary to the sale of a business and those ancillary to employment"). We need not consider whether contracts arising under those different circumstances are subject to different treatment. See Alexander & Alexander, Inc. v. Danahy, 488 N.E.2d 22, 28 (Mass. App. Ct. 1986) (stating that "there are considerations which dictate that noncompetition covenants arising out of the sale of a business be enforced more liberally than such covenants arising out of an employer-employee relationship"). We simply note that the APA's creation of non-compete covenants between the buyer (the plaintiff) and the seller (the Company) is of no interpretive significance with respect to whether it assigns to the plaintiff a wholly separate employee non-compete agreement.

To the extent the defendants argue that Morris's non-compete agreement was not conveyed to the plaintiff because the law that governs the non-compete agreement precludes conveyance under the circumstances, we conclude that the argument suffers much the same infirmity as the plaintiff attributes to the trial court's decision; namely, "conflating the issue of whether the [non-compete] agreement was an asset acquired by Plaintiff, with the separate and distinct issue of whether Morris consented to the assignment of that agreement, where the issue of Morris' consent was not before the court." (Emphasis added.)

The non-compete agreement provides that it "shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts." The defendants contend that while "[t]he Massachusetts Supreme Judicial Court has not yet addressed whether an employer may assign an employee non-compete agreement in an asset sale" without the employee's express consent, "Massachusetts decisional law strongly suggests the Morris non-compete agreement is not assignable absent the express consent of Morris." The defendants acknowledge, however, that the trial court in this case "never reached th[at] question," but, rather, concluded that the plaintiff lacked standing "because the APA did not assign the Morris non-compete agreement in the first place." Because the trial court has not ruled on this issue, we decline to do so in the first instance. See Dolbeare v. City of Laconia, 168 N.H. 52, 54 (2015).

Finally, the defendants argue that, even if Morris's non-compete agreement was assigned to the plaintiff, the plaintiff would still not be able to enjoin Morris from working for Scott. The defendants first contend that, because the Company continues to exist under the name PSJL Corporation and, they assert, "the non-compete agreement [only] barred Morris from competing against PSJL Corporation or its subsidiaries," it could not be used to prevent Morris from competing with the plaintiff. The defendants also assert

7

that "whatever restrictions governed Morris under the non-compete agreement ended in July 2017, three years after he ceased employment with PSJL Corporation." Accordingly, they argue that the plaintiff's "claims for equitable relief are moot." We decline to address these arguments because, so far as appears on the record before us, the trial court has not ruled on them, and we decline to do so in the first instance. See id.

Because we conclude that Morris's non-compete agreement was conveyed to the plaintiff under the plain language of section 2.02(a)(xii), we need not address either the plaintiff's additional arguments or the defendants' argument that the plaintiff's "numerous theories for why the Morris non-compete agreement was assigned to it irrespective of the language of the APA . . . find [no] support in Massachusetts law."

Reversed and remanded.

LYNN, C.J., and HANTZ MARCONI, J., concurred.

8