Hillsborough County Probate Court
No. 2000-325

IN RE PACK MONADNOCK

Argued: November 7, 2001
Opinion Issued: February 8, 2002

*Thomas F. Irwin*, staff attorney, Conservation Law Foundation, of Concord by brief and orally, for the plaintiff.

*Philip T. McLaughlin*, attorney general (*Douglas N. Jones*, assistant attorney general, on the brief, and *Mary Castelli*, assistant attorney general, orally), for the defendant.

DUGGAN, J. The plaintiff, Conservation Law Foundation (CLF), appeals an order by the Hillsborough County Probate Court (*Cloutier*, J.), denying its request to remove a communication tower located on the summit of Pack Monadnock. We affirm.

In 1891, the legislature enacted Laws 1891, chapter 78, appropriating $3,000 to aid in the construction of a road to the summit of Pack Monadnock, on the condition that owners of property located on the summit dedicate their properties to the public to be used as a public park and pleasure ground. In November 1891, after the enactment of chapter 78, State Representative Frank G. Clarke drafted the deeds by which Charles F. Melendy conveyed approximately two acres of summit land (Melendy tract) and Austin Spofford conveyed approximately one acre of summit land (Spofford tract). The nearly identical deeds conveyed the property to

B.P. Cheney and his heirs and assigns, to their own use and behoof forever, but in trust, nevertheless for the following purpose, namely:

The same to be forever kept as a public park or pleasure ground for public use, and to be known as the General James Miller Park, in memory of the late General James Miller. To be occupied and enjoyed by the public under such reasonable rules and regulations as said grantee and his successors may from time to time prescribe.

Authority is hereby vested in said grantee to appoint any native born citizen of New Hampshire as his successor to said trust. In case of failure to so appoint, such successor shall be appointed by his Excellency the Governor of New Hampshire.

B.P. Cheney recorded the deeds on June 14, 1892. Cheney, however, never exercised any control over General James Miller Park (park), nor did he appoint a successor trustee prior to his death in 1895. At no time following Cheney's death did the Governor appoint a successor trustee as required in the deeds.

Since 1892, the State has treated the land as a state reservation. For example, during the dedication of the park on June 22, 1892, Governor Tuttle was reported as "accepting the Park in behalf of the State." Furthermore, in a 1906 Report of the Highway Engineer and Governor and Council, the park was described as a "state reservation." In 1915 the legislature authorized the forestry commission to manage and care for the park in accordance with Laws 1909, 128:20, which established the forestry commission's authority to direct any improvements on land vested in the State and "forever held for the purposes of a public park." Laws 1915, ch. 187.

Since 1915, the park has been managed as a public park by various State agencies and several improvements have been made, including the addition of 530 acres of land. Currently, the New Hampshire Department of Resources and Economic Development (DRED) manages the park.

In 1938, DRED erected a fire tower on the Melendy tract and over the years, several antennae were affixed to it. In 1997, DRED issued a permit to the New Hampshire Department of Safety to construct a 134-foot communication tower and a small accompanying communication building on the Melendy tract. The facilities were designed to function as part of a state-wide, multi-user public safety communications network administered by the department of safety, and to replace the antenna tower and equipment building located at the fire tower.

By December 1998, construction of the communication tower was almost complete. On December 23, 1998, CLF commenced an equitable proceeding in superior court seeking the removal of the new facility from

the Melendy tract. CLF argued that the construction of a communication tower violated the terms of the trust created by the Melendy deed in 1891.

The State moved to dismiss the superior court proceedings for lack of jurisdiction, arguing that the probate court has exclusive jurisdiction over the interpretation, construction and modification of express trusts pursuant to RSA 547:3, I(c) (Supp. 2001). The State then filed a petition for instructions in the probate court asking whether it is appropriate for the State to continue to use the Melendy tract, "conveyed to it in 1891 as a charitable trust for use as a public park and pleasure ground, for public safety purposes, when changing communications and technological needs make the summit of Pack Monadnock a critical link in a state-wide public communications system used by public agencies, including state and local police?" The Superior Court (*Smukler*, J.) stayed its proceeding pending the resolution of the trust issues before the probate court.

After holding a trial, the probate court determined that the unambiguous terms of the deed conveyed the property to Cheney in trust. It also determined that Melendy conveyed the property to Cheney, in trust, for the sole purpose of providing a temporary mechanism to convey title to the State, with Cheney only acting as an "instrument to pass title." Thus, the probate court determined that the State has a legal interest in the Melendy tract in the form of a "reservation" and that Melendy's intent was for the land to be used as a public park or pleasure ground for public use and to be known as the General James Miller Park.

In determining whether the erection of the tower violated the express language of the trust, the probate court noted that it is unclear whether Melendy intended to create a public trust or a covenant to run with the land. It concluded that irrespective of whether Melendy intended to convey a public trust or a covenant, "the land has always been used by the State as a public park or pleasure ground for public use and acted on as a reservation of the State." The court denied CLF's request to remove the communication tower because the park has been used in accordance with the expressed intent of the grantor, and the erection of the tower does not interfere with the recreational use of the land.

On appeal CLF argues, among other things, that the probate court erred in ruling that the State acquired a legal interest in the property because the court: (1) erroneously relied upon extrinsic evidence or, in the alternative, lacked sufficient evidence to support its finding that Melendy intended the property to be used as a state reservation; (2) exceeded its subject matter jurisdiction; and (3) failed to rule that the State was judicially estopped from arguing that it acquired a legal interest in the property because the State originally represented that the deed created an enforceable charitable trust.

First, CLF argues that the probate court erred in ruling that the communications facility does not violate unambiguous deed language requiring the Melendy tract to be held in trust, to be forever kept as a public park or pleasure ground. In support of this argument, CLF asserts that the probate court erroneously considered extrinsic evidence in order to determine Melendy's intent. Alternatively, CLF argues that there was insufficient evidence to support the court's finding that Melendy intended the property to be used as a state reservation.

■ ■ "It is well established in this jurisdiction that our courts have shown a signal regard for the intention of a settlor of a trust." *Indian Head Nat'l Bank v. Brown*, 123 N.H. 87, 91 (1983) (quotation, brackets and ellipses omitted). In determining the settlor's intent, courts should look to the terms of the trust. *See Bartlett v. Dumaine*, 128 N.H. 497, 504 (1986). Where a court is construing an inter vivos trust evidenced by a written instrument, "the terms of the trust are determined by the provisions of the instrument as interpreted in the light of all the circumstances and other competent evidence of the intention of the settlor with respect to the trust." *Id.* at 505 (quotation, ellipses and brackets omitted). In ascertaining the settlor's intent, extrinsic evidence may not be used to vary or contradict the express terms of the trust. *See id.* Extrinsic evidence may, however, be considered whenever the language is ambiguous. *See id.*

■ The probate court determined, "It is true that the deed is unambiguous on its face. That it conveys to B.P. Cheney in trust nevertheless." The probate court also determined that it is unclear what Melendy intended to convey in using the term "public park or pleasure ground for public use." In order to ascertain Melendy's intent in using this term, the probate court looked beyond the four corners of the deed and relied upon various newspaper accounts and legislation surrounding the development of the park. Because the settlor's intent in using the term "public park or pleasure ground for public use" is ambiguous, the probate court's reliance upon extrinsic evidence was proper.

CLF next argues that the record lacks sufficient evidence to support the probate court's determination that by using the term "public park or pleasure ground for public use," Melendy intended the property to be used as a state reservation.

The interpretation of a trust is a question of law, based on competent evidence of the settlor's intent as properly found by the trial court. *Robbins v. Lake Ossipee Village, Inc.*, 118 N.H. 534, 536 (1978). On appeal, the probate court's finding of fact must be reviewed for plain error, to determine whether it is supported by the evidence and not erroneous as a

matter of law. *In re Jesse F.*, 143 N.H. 192, 193-94 (1998). We will sustain the probate court's finding of fact if, on the reported evidence, any reasonable person could so find. *Bartlett v. Dumaine*, 128 N.H. at 505.

On the record before us, we conclude that a reasonable person could find that Melendy intended the property to be used as a state reservation. In determining that the purpose of the trust was to provide a temporary mechanism for the State to take title to the land to eventually be used as a state reservation, the probate court relied upon newspaper accounts and legislation surrounding the park's development. Although these accounts may have low probative value, considering the dearth of direct evidence regarding Melendy's intent in conveying the property, the probate court did not err in relying upon this evidence. *See* RESTATEMENT (SECOND) OF TRUSTS § 4 comment *a* at 13 (1959) (recognizing that the intention of the settlor at the time of the creation of the trust may be shown by facts occurring after that time).

In 1891, no statutes or appropriations enabled the State to acquire, own or maintain land for the purpose of public parks. Rather, the first such statute was enacted in 1893. *See* Laws 1893, 44:4. Although the deed conveys the property "in trust" to Cheney, there is no evidence that the property was expected to be maintained in trust. For example, no trust fund or other assets were provided to compensate Cheney, as the trustee, for the on-going expense of maintaining a "public park or pleasure ground." Moreover, Cheney never performed any duties as a trustee of the property, he ultimately surrendered the original deeds to the State and he did not dispose of the property as part of his estate. In addition, in enacting Laws 1891, chapter 78, the legislature required that before appropriating funds to construct a road to the summit of Pack Monadnock,

> the owners of land upon the summit of Pack Monadnock Mountain, and persons interested, shall lay out and dedicate to public use on said summit, free of expense to the state, *a park or pleasure-ground* of an area satisfactory to the governor and council, *the same to be forever kept for public use and known as the General James Miller Park,* in memory of the late General James Miller.

(Emphasis added.) The fact that both the statute and Melendy's deed require the property to be forever kept as a public park or pleasure ground for public use supports the probate court's conclusion that Melendy did not intend for the property to be held "in trust," but rather intended to comply with the requirements contained in the legislation.

■ Additionally, both the newspaper accounts and the legislation concerning the park support a finding that, since 1892, the property has been viewed by the public and the State alike not as a trust, but rather as a "state park" or a "state reservation." For instance, in July 1892, a newspaper article described the park as "the first state park opened in New England." Laws 1915, chapter 187, states that the property belongs to the State "having been conveyed to the State, [by] B.P. Cheney, late of Peterborough, acting as trustee for the state," and subsequently placed the park "under the jurisdiction of the Forestry Commission." The Forestry Commission Biennial Report for the years 1915–1916 lists the park as a "state reservation" acquired in 1891 and as one of the oldest of the "state reservations." This evidence, viewed in its totality, is sufficient to sustain a finding that the purpose of the deed was to provide a temporary mechanism for taking title to land that would eventually be operated by the State as a "state reservation."

Because the probate court properly determined that the trust was intended to create a state reservation, we need not address CLF's remaining arguments regarding the permissibility of the construction of the communication tower. The terms "state reservation" or "public reservation" are used to identify land owned or leased by the State. *See* RSA 227-G:2, XV (2000) (defining "reservation" as public land under the jurisdiction of DRED). So long as DRED is permitted to allow the construction of communication towers on its land pursuant to RSA 227-H:9 (2000), it is unnecessary to address CLF's remaining arguments.

■ CLF next argues that the probate court exceeded its jurisdiction by determining that the State has a legal interest in the property. Pursuant to RSA 547:3, I(c) (Supp. 2001), the probate court has exclusive jurisdiction over the "interpretation and construction of wills and the interpretation, construction, modification, and termination of trusts ...." Thus, the probate court had jurisdiction to determine whether the Melendy deed created a trust, and if so, the purpose, scope, and duration of that trust. As such, the probate court did not exceed the scope of its jurisdiction in determining that the trust provisions of the Melendy deed were limited to providing a mechanism for transferring title to the State.

Lastly, CLF urges us to adopt and apply the doctrine of judicial estoppel. CLF claims that references to a charitable trust contained in the State's petition for instructions judicially estops the State from subsequently arguing that the Melendy deed did not create a charitable trust or that the trust had terminated.

The doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a

contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 121 S. Ct. 1808, 1814 (2001) (quotation omitted). The purpose of judicial estoppel is "to protect the integrity of the judicial process." *Id.* One factor to consider in deciding whether to apply the doctrine of judicial estoppel is whether the party's later position is "clearly inconsistent" with its earlier position. *See id.* at 1815. Courts also regularly inquire whether "the party has succeeded in persuading a court to accept that party's earlier position." *Id.* "A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.*

██ Judicial estoppel, even if we were to adopt it, would not benefit CLF. The State did not unequivocally assert that the deed created a charitable trust. Rather, the State wavered as to whether the deed created an express trust or, more specifically, a charitable trust. The record is also devoid of evidence that the State succeeded in persuading either the superior court or the probate court to accept its earlier representation that the deed created a charitable trust. Thus, because the State's original representation that the deed created a charitable trust did not induce either the probate court or superior court to take action, the application of judicial estoppel to this case would not affect the outcome.

*Affirmed.*

BRODERICK, NADEAU and DALIANIS, JJ., concurred.