UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Evan W. Gray

      v.
                                       Civil No. 18-cv-522-JL
                                       Opinion No. 2020 DNH 125

Chester L. Gray III


## MEMORANDUM OPINION & ORDER

Chester L. Gray III ("Skip") moved for partial summary judgment (doc. no. 62) on

Counts 1 and 2 of Attorney Evan W. Gray's Amended Complaint and for summary

judgment on Count 2 of the CLG Estate Counterclaims.[1]  The court (DiClerico, J.)

granted summary judgment in Skip's favor as to Counts 1 and 2 of Attorney Gray's

Amended Complaint to the extent Attorney Gray brought those claims outside his

capacity as co-trustee of the BJG Trust.  As to Count 2 of the CLG Estate Counterclaims,

the court ordered Attorney Gray to show cause why it should not treat his undue

---

[1] The complete procedural setting of this case, which involves disputes among three brothers, Skip, Scott, and Attorney Evan W. Gray, is discussed in more detail in Judge DiClerico's prior orders.  E.g., Gray v. Gray, No. 18-CV-522-JD, 2019 WL 6701989, at *1-*4 (ECF doc. no. 71).  In those prior orders, Judge DiClerico referred to the members of the Gray family by their first names for the sake of clarity and succinctness.  For the same reasons, the undersigned does the same.  Attorney Gray, however, has objected to the court's use of his first name.  The court therefore refers to him as "Attorney Gray," as it did during oral argument without objection.

    The court will also use the abbreviations for Barbara Gray's trust ("BJG Trust"), Chester Gray's trust ("CLG Trust"), and his estate ("CLG Estate"), consistent with Judge DiClerico's prior orders.  E.g., doc. nos. 54, 55, 71.  Likewise, the court uses the abbreviations for the counterclaims brought by Skip as trustee of the CLG Trust and executor of the CLG Estate (the "CLG Estate Counterclaims") and for the claims brought by Skip as a trustee of the BJG Trust (the "BJG Trust Counterclaims").

influence affirmative defense as a counterclaim. The court stayed ruling on the merits of Skip's motion as to Count 2 of the CLG Estate Counterclaims until briefing and ruling on the undue influence affirmative defense issue was complete.

The parties completed briefing on the issue, but, before any ruling was issued, Attorney Gray moved to disqualify Judge DiClerico under 28 U.S.C. § 455(a). Judge DiClerico granted Attorney Gray's motion in part and recused himself from the case, but he denied Attorney Gray's motion to the extent it sought vacatur of prior orders. The case was reassigned, and the court held oral argument on the motion for partial summary judgment by videoconference on July 9, 2020. Attorney Gray and counsel for Skip attended and participated in the argument.

The court now addresses Skip's motion for partial summary judgment as it relates to Count 2 of the CLG Estate Counterclaims. The court grants Skip's motion for summary judgment as to Count 2 of the CLG Estate Counterclaims and enters a declaratory judgment in his favor.

## I.    **Applicable legal standard**

Summary judgment is appropriate when the moving party shows "the record, construed in the light most congenial to the nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law." McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017); see also Fed. R. Civ. P. 56(a). A factual issue "is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Ellis v. Fidelity Mgmt. Trust

2

Co., 883 F.3d 1, 7 (1st Cir. 2018). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." DeAndrade v. Trans Union LLC, 523 F.3d 61, 65 (1st Cir. 2008) (internal quotations omitted); accord Oahn Nguyen Chung v. StudentCity.com, Inc., 854 F.3d 97, 101 (1st Cir. 2017).

## II.     Background

### a.     BJG Trust & CLG Trust

Chester and Barbara Gray are the parents of Skip, Scott, and Attorney Gray. Chester and Barbara created two trusts, the CLG Trust (by Chester) and the BJG Trust (by Barbara). The trusts were initially created in 1996, but were amended and restated in 2011.

Attorney Nicholas Harvey prepared the 2011 trust terms for Chester and Barbara. In his declaration, Attorney Harvey stated that he has a "present memory" of working with both Chester and Barbara on their estate plans.[2] Attorney Harvey added that "Chester, a retired lawyer, was particularly attentive to the details of the plans."[3]

Under the 2011 terms, Barbara and Chester served as the initial co-trustees of both the CLG Trust and the BJG Trust, which were revocable until their respective settlor's death, at which point they became irrevocable under their provisions. Among the assets included in the CLG Trust is real estate located in Grafton and Springfield, New Hampshire.

---

[2] Harvey Decl. (doc. no. 62-2) at 2 ¶ 3.
[3] Id.

3

The CLG Trust exists, in part, to hold and maintain the Grafton and Springfield real estate for Barbara and Chester's descendants "for as long as is reasonably and prudently possible."[4] To that end, the CLG Trust provides that, after Chester's death, the real estate will be held in a Continuing Trust, which shall exist until certain conditions outlined in Article 2.2.A(2)-(4) of the CLG Trust are met.

In addition, after Chester's death, the CLG Trust provides for the creation of a "maintenance fund" for the real estate, which is to be funded with assets valued at $820,000 adjusted for inflation. After all of the CLG Trust provisions have been satisfied, the remainder of the CLG Trust's assets are to be distributed equally among Barbara and Chester's three sons: Skip, Scott, and Attorney Gray.

The BJG Trust provides for the management of Barbara's assets before and after her death. Barbara died on April 9, 2013. Following Barbara's death, Chester became sole trustee of both trusts. Chester remained as trustee of both the BJG Trust and the CLG Trust until his death on April 26, 2017.

The BJG Trust includes provisions that became effective after the death of both Barbara and Chester. One of the principal provisions of the BJG Trust is Article 2.4.A, which provides:

> If at the time of the death of my husband and myself, the amount of liquid assets held in the continuing trust for real estate located in Grafton and Springfield, New Hampshire as set forth in my husband's trust is less than [$820,000 adjusted for inflation], I direct that my trustee distribute from my

---

[4] CLG Trust (doc. no. 62-3) at 4.

4

trust an amount of property that will increase the sums held in said continuing trust of my husband's to [$820,000 adjusted for inflation].[5]

The "remainder of the trust property" is to be distributed equally among Skip, Scott, and Attorney Gray.[6]

After Chester's death, Skip, Scott, and Attorney Gray became co-trustees of the BJG Trust, and Skip became sole trustee of the CLG Trust. Skip is the executor of Chester's estate.

### b. Pre-litigation correspondence regarding operation of CLG Trust and BJG Trust

Prior to this suit, Skip retained counsel to represent him as fiduciary of the CLG Trust and CLG Estate. Initially, Skip retained Attorney Catherine Richmond of Stebbins Bradley, PA, before retaining current counsel Attorney Ralph Holmes. Attorneys Richmond and Holmes, as well as a Stebbins Bradley paralegal, Vicki Raymond, corresponded with Attorney Gray about the BJG Trust and CLG Trust throughout 2017 and 2018. Attorney Gray filed this lawsuit on June 13, 2018.

## III. Discussion

Skip moves for summary judgment as to Count 2 of the CLG Estate Counterclaims. In Count 2, Skip requests a declaratory judgment that "in the event that [Attorney Gray's] action results in an underfunding of the Maintenance Fund, the

---

[5] BJG Trust (doc. no. 62-4) at 4. The BJG Trust directs the inflation adjustment to be calculated "in accordance with the percentage changes in the Consumer Price Index – All Urban Consumers (Northeast Region) from January 1, 2011 until January of the year of my death . . . ." Id.
[6] Id.

Counterclaim/Crossclaim Defendants, as Co-Trustees of the BJG Trust, shall be required to make up for the deficiency created."[7]  Skip contends that the unambiguous, plain meaning of Article 2.4.A of the BJG Trust and Article 2.2 of the CLG Trust, which together create a "pour over" of funds from the BJG Trust to the CLG Trust, requires a determination of the pour-over amount only after all obligations against the CLG Trust have been paid or provided for.  In his motion for summary judgment, Skip also argues that Attorney Gray cannot succeed on his affirmative defense of equitable estoppel.

Attorney Gray argues that the plain meaning of Article 2.4.A of the BJG Trust requires the pour-over amount to be determined at the time of the surviving spouse's death, namely, Chester's death.  He also contends that genuine disputes of material fact as to his affirmative defenses preclude summary judgment in Skip's favor.  In his "Fifth Defense," equitable estoppel, Attorney Gray contends that Skip's prelitigation communications estop him from seeking a pour over from the BJG Trust to overcome any deficiency in the CLG Trust maintenance fund.   In his "Sixth Defense," unclean hands, Attorney Gray contends that Skip cannot enforce the BJG Trust pour-over provision because it was procured by Chester through undue influence.  At oral argument, Attorney Gray acknowledged that his opposition to Skip's motion for summary judgment on Count 2 of the CLG Estate Counterclaims is limited to equitable estoppel, unclean hands, undue influence, and the plain language of the trusts.[8]

---

[7] CLG Estate Counterclaims (doc. no. 36) ¶ 35.
[8] Scott Gray did not file any opposition to Skip's motion for summary judgment.

6

At the court's direction, Skip and Attorney Gray also briefed the issues of whether the undue influence allegation asserted by Attorney Gray in his opposition and Sixth Defense must be presented as a counterclaim and whether, if the undue influence theory must be presented as a counterclaim, it is futile as time barred under RSA 564-B:4-406(b).

### a.    Equitable estoppel (Fifth Defense)

Attorney Gray asserts that, under the doctrine of equitable estoppel, Skip cannot contradict positions taken in pre-litigation communications on the BJG Trust's pour-over clause.  In support of this equitable estoppel defense, Attorney Gray identifies four communications that he says contain material misrepresentations or omissions that he relied on:  a May 12, 2017, letter from Attorney Richmond; a May 23, 2017, e-mail from Vicki Raymond; a July 5, 2017, letter from Attorney Richmond; and an October 11, 2017, letter from Attorney Holmes.  Attorney Gray contends that, in these communications, Skip (through his counsel) represented that the CLG Trust assets exceeded the amount necessary to fund the maintenance fund, that Skip failed to indicate that the BJG Trust would have to pay for or wait for creditor claims against the CLG Estate to be resolved before distributing its assets to the residual beneficiaries, and that Skip did not indicate that the distribution of funds from the BJG Trust would be delayed beyond May 2017.  Skip argues that he made no material misrepresentations or omissions on which Attorney Gray reasonably relied.

"Equitable estoppel serves to forbid one to speak against his own act, representations or commitments communicated to another who reasonably relies upon them to his injury." The Cadle Co. v. Bourgeois, 149 N.H. 410, 418 (2003). "The burden of proving estoppel is upon the party asserting it, and its existence is a question of fact to be resolved by the trier of fact." Hawthorne Trust v. Maine Sav. Bank, 136 N.H. 533, 538 (1992) (quoting Olszak v. Peerless Ins. Co., 119 N.H. 686, 690 (1979)).

Equitable estoppel requires the party asserting it to prove (1) that there was a knowingly false representation or concealment of material facts; (2) that he was intentionally, or through culpable neglect, induced to rely upon the false representation or concealment; and (3) an injury resulted from such reliance. Cohoon v. IDM Software, Inc., 153 N.H. 1, 8-9 (2005); Hawthorne Trust, 136 N.H. at 537-38; Great Lakes Aircraft Co. v. City of Claremont, 135 N.H. 270, 290 (1992). Reliance on a false representation or concealment of material fact must be reasonable. See Bourgeois, 149 N.H. at 418. "Reliance is unreasonable when the party bringing the estoppel claim, at the time of his or her reliance or at the time of the representation or concealment, knew or should have known that the conduct or representation was either improper, materially incorrect or misleading." Id. "Incorporated into the concept of reasonable reliance is the requirement that the moving party exercise due diligence to learn the truth of a matter relied upon." Id.

8

### i.    May 12 letter from Attorney Richmond

In a May 12, 2017, letter to Skip, Scott, and Attorney Gray, Attorney Richmond

wrote:

> Your father, Chester L. Gray, Jr., during his lifetime, created the Chester L. Gray, Jr. Trust of 1996 dated August 5, 1996. The currently operative provisions are set forth in the First Amendment and Complete Restatement dated February 1, 2011. At the time of his death, the Trust became irrevocable. Each of you are a so-called distributee of the Trust (as defined by New Hampshire law) and for that reason we have enclosed with this letter a formal "Notice to Distributees".
>
> [Skip] is currently serving as the trustee of the Trust.
>
> Pursuant to Article 2.1, all of the tangible personal property held in the primary residence in Grafton which the son, [Skip], would like to use and retain in the trust shall be held as a trust asset for his benefit together with the other trust beneficiaries and in accordance with the provisions of Article 2.2. All of the remainder of the tangible personal property shall be distributed in reasonably equal shares to those children then living. Article 2.1 further directs that the trustee shall pay the reasonable costs of delivering tangible personal property to the person entitled at his residence as an expense of administration.
>
> Articles 2.2 A. (1) (2) (3) and (4) establish a trust in the amount of $820,000 as a maintenance fund and makes provisions for the real estate located in Grafton and Springfield, New Hampshire.
>
> Pursuant to Article 2.2 B., the remainder of the trust property shall be distributed equally among the sons, outright.
>
> If you have any questions, please contact Skip, the trustee, or let us know.[9]

The letter included a "Notice to Distributees" that stated that "[a]ll of the operative

---

[9] May 12 Letter (doc. no. 65-33) at 2-3.

provisions are set forth in the First Amendment and Complete Restatement dated February 1, 2011."[10]

Attorney Gray contends that he relied on Attorney Richmond's "failure to mention" in the May 12, 2017, letter "any adjustment to the $820,000 amount" of the maintenance fund and her "failure to refer to any expenses [or] obligations of the CLG Trust being payable prior to the establishment of the maintenance fund and the distribution of the remainder to the distributees."[11]  In his declaration, Attorney Gray states that he relied on these representations and omissions "in connection" with his determination of whether to accept a co-trusteeship of the BJG Trust "under the 2011 BJG Trust Instrument or a sole trusteeship under the 1996 BJG Trust Instrument." [12]

Attorney Gray erroneously characterizes Attorney Richmond's omission in her letter of certain terms of Article 2.2 of the CLG Trust as making materially false representations or omissions in light of the declaratory judgment sought by Skip. Nothing about the May 12, 2017, letter or its context suggests knowing falsity or intentional concealment.

Considered in context, Attorney Richmond's May 12, 2017, letter is a brief and general notification to the residual beneficiaries – Skip, Scott, and Attorney Gray – about the terms of the trust as they were relevant to the beneficiaries at the time.  While the letter notes some of the terms of the trust, it does not purport to summarize all provisions

---

[10] Id. at 3.
[11] Attorney Gray Decl. (doc. no. 65-2) at 11-12 ¶ 44.
[12] Id. ¶ 44.

of the trust.  The letter refers the recipients to the "currently operative provisions" [13] of the CLG Trust, which Attorney Gray had available to him.  Furthermore, Attorney Richmond's letter invites the recipients to present any questions to Skip or the Stebbins Bradley firm.  If Attorney Gray had any doubt about the effect of a lawsuit he would bring to recover from CLG Trust on his residual share of the CLG Trust or the BJG Trust, he could have asked. [14]

For those reasons, Attorney Richmond's May 12, 2017, letter does not support an equitable estoppel defense to Count 2 of the CLG Estate Counterclaims.  See Hawthorne Trust, 136 N.H. at 538.

### ii.      May 23 e-mail from Vicki Raymond

In a May 23, 2017, e-mail to Attorney Gray, Vicki Raymond told Attorney Gray that "a substantial interim distribution" from the BJG Trust could be made once all three brothers accepted appointment as co-trustees of the BJG Trust.[15]  Attorney Gray states that he relied on the allegedly false representation that there was "no impediment" to the BJG Trust making a "substantial" distribution of its assets.[16]

Attorney Gray has not presented evidence that this e-mail contains a knowingly false representation on which he reasonably relied.  Raymond's e-mail was sent well before Attorney Gray gave notice of his claims and filed this lawsuit, which, the evidence shows, is the reason that there has been no distribution of the BJG Trust assets.

---

[13] May 12 Letter at 2.
[14] Id. at 3.
[15] May 23 Letter (doc. no. 65-35) at 2.
[16] Attorney Gray Opposition (doc. no. 65-1) at 25.

Therefore, Raymond could not have known that there was, in fact, an impediment to the BJG Trust making a substantial distribution of its assets. Accordingly, Raymond's May 23, 2017, e-mail does not support an equitable estoppel defense as to Count 2 of the CLG Estate Counterclaims. See Hawthorne Trust, 136 N.H. at 538 (stating that a misrepresentation must have been made with knowledge of the material facts).

### iii.     July 5 letter from Attorney Richmond

In a July 5, 2017, letter to the brothers, Attorney Richmond discussed the CLG Trust terms. In that letter, Attorney Richmond wrote:

> As you know, Section 2.2.B. gives each of you an equal share of the remainder of the property held in your father's trust after payment of any estate/trust taxes and administration expenses and satisfaction of the provisions of Sections 2.1 and 2.2.A. Section 2.2.A. sets aside $820,000 (adjusted in accordance with the percentage changes in the CPI - All Urban Consumers [Northeast Region] from January 1, 2011 until January 1, 2017 [the year of your father's death]), to be held in a separate real estate trust.
>
> Depending on the value of the assets in your father's overall estate for estate tax purposes (including, for example, all retirement accounts, life insurance policies, assets in or passing to the above trust, probate estate assets, transfer on death or payable on death accounts, life estates), his estate may exceed the federal estate tax exemption and an estate tax may be due. It depends on the value of all the assets as of his date of death and the amount of the lifetime gifts he may have made that used his gift/estate tax exemption.
>
> We are in the process of determining this to calculate the amount you will receive under Section 2.2.B. of your father's trust.
>
> We have calculated the amount to set aside for the Section 2.2.A. trust. Because of the apparent tension between the three of you, I am providing you with a copy of the CPI - All Urban Consumers [Northeast Region] percentages from January 1, 2011 until January 1, 2017 and our calculation of the adjustment to $920,646. We rounded to the nearest dollar. Please let me know in writing by July 31, 2017, if you think the calculation should be different and if so why you think it should be different, the amount you

calculate and how you arrived at that amount. If we do not hear from you in writing by July 31, 2017, we will assume the $920,646 amount to allocate to the Section 2.2.A. trust is acceptable. The time spent on this calculation is necessary to determine the Section 2.2.B. amount each of you will receive and is an expense of the overall trust, not the Section 2.2.A trust.[17]

Attorney Gray responded on July 28, 2017, stating in relevant part:

> 2. The formation of any maintenance fund under Article 2.2.A.(1) of the Trust is premature because:
>
> a. the following condition thereto has not been met: pursuant to Article 2.2.A.(1) of the Trust, the real estate located in Grafton and Springfield, New Hampshire, shall only be held in trust "if[] Chester (known as 'Skip') elects to use said real estate as his primary residence or a vacation home . . . ." Until such time as [Skip] makes such election and notifies the other Trust beneficiaries and distributes of such election, there is no basis for a maintenance fund, and no basis for a CPI calculation with respect thereto. I note that [Skip] has informed me that he has been on vacation this week, and he apparently has not been at the real estate in Grafton and Springfield for such vacation.
>
> . . .
>
> 5. Because the amount of any maintenance fund established pursuant to Article 2.2.A.(1) of the Trust (i) would primarily benefit [Skip] and (ii) would adversely affect the other qualified beneficiaries of the Trust, including myself and Scott D. Gray, by reducing the amount distributable to us under Article 2.2.B. of the Trust, any calculation of such amount by or on behalf of [Skip] is affected by a conflict between the fiduciary duties and personal interests of [Skip], and is voidable by myself or Scott D. Gray, as beneficiaries, pursuant to Section 564-B:8-802(b) of the New Hampshire Trust Code. Your proposed calculation also is subject to challenge because it is contrary to, and misinterprets, the relevant clause of the Trust, and it would violate [Skip's] duty of impartiality under Section 564-B:8-803 of the New Hampshire Trust Code.
>
> 6. The assets that are to be used to fund the contingent "maintenance fund" set forth in Article 2.2.A.(1) of the Trust are not identified or otherwise specified in the Trust. Because the Trust assets used to fund any maintenance fund established pursuant to Article 2.2.A.(1) of the Trust (i)

---

[17] July 5 Letter (doc. no. 65-38) at 2-3.

would primarily benefit [Skip] and (ii) would adversely affect the other qualified beneficiaries of the Trust, including myself and Scott D. Gray, by eliminating such particular assets from the assets that are distributable to us under Article 2.2.B. of the Trust, the determination/allocation of the particular Trust assets to be included in any such maintenance fund by or on behalf of [Skip] is affected by a conflict between the fiduciary duties and personal interests of [Skip], and is voidable by myself or Scott D. Gray, as beneficiaries, pursuant to Section 564-B:8-802(b) of the New Hampshire Trust Code. Thus, such maintenance fund cannot be established until the beneficiaries/distributes receive the report referenced in paragraph 2.b above, and are able to agree on which Trust assets shall be included in the maintenance fund and which shall be distributed to us under Article 2.2.B.[18]

On August 8, 2017, Attorney Richmond responded on Skip's behalf, informing Attorney Gray that Skip disagreed with the "presumptions and allegations" made in Attorney Gray's July 28 letter and stated that "there has been no waiver of the CPI adjustment or any other provisions of Section 2.2.A of the Trust."[19]

Pointing to the July 5, 2017, letter from Attorney Richmond, Attorney Gray argues that Attorney Richmond omitted any mention that "debts" of the CLG Trust would need to be paid before the brothers received their shares of the remainder property of the CLG Trust. Attorney Gray, however, does not explain how he relied on Attorney Richmond's July 5 letter, nor does he show that Attorney Richmond's omission was knowingly false. Attorney Richmond had no reason to mention any possibility that this litigation, which was not yet filed by Attorney Gray, might create a debt of the CLG Trust that would need to be paid out before proceeding with the provisions of Article 2.2. Indeed, that information was in Attorney Gray's possession, and, once he disclosed that he planned to

---

[18] July 28 Letter (doc. no. 62-18) at 1-2.
[19] August 8 Letter (doc. no. 62-19) at 1.

14

file suit, Skip's counsel promptly informed Attorney Gray about the likely effect the suit would have on Attorney Gray's residual share.[20]

### iv. October 11 letter from Attorney Holmes

On October 11, 2017, Attorney Holmes, now representing Skip, wrote to Skip, Scott, and Attorney Gray:

> As you are aware, the [CLG Trust] in Article 2.2.A.(1) provides for the establishment of a "Continuing Trust" to be funded with real estate and $820,000 as adjusted by the CPI (the "Maintenance Fund"). The Continuing Trust is to be established if Skip "elects to use said real estate as his primary residence or as a vacation home." I understand that Skip has elected to receive the benefits of the Continuing Trust and that he will be engaging separate counsel relative to his rights and interests as a beneficiary.
>
> Per the enclosed, we calculate the amount required for the Maintenance Fund as $896,304.80. I have read the correspondence between [Attorney Gray] and prior counsel and note that [Attorney Gray] believes that Skip waived the right to the CPI adjustment when counsel for the Trustee did not reference the CPI adjustment in her letter of May 12, 2017. The Trustee has a duty to follow the terms of the Trust which mandates the CPI adjustment and intends to do so. If needed, we can petition the Probate Court and try the waiver claim.[21]

Attorney Gray responded in a letter dated November 20, 2017:

> 2.     Your statement that you "understand that Skip has elected to receive the benefits of the Continuing Trust" lacks any factual support and reflects a misapprehension of the Trust terms. As you state elsewhere, a continuing trust is only to be established under Article 2.2.A.(1) of the Trust "if [Skip] elects to use [the Grafton/Springfield] real estate as his primary residence or as a vacation home." Skip must make an election to use the real estate either as his primary residence or as a vacation home; he may not, as you suggest, "elect to receive the benefits of the Continuing Trust" without making such a specific election. Skip has not notified myself or my brother

_____

[20] See doc. 62-9 at 1-2 (January 5, 2018, letter from Attorney Holmes to the BJG Trust trustees discussing Attorney Gray's December 12, 2017, notice of claims).

[21] October 11 Letter, (doc. no. 62-20) at 1-2.

Scott of any such election. Accordingly, the formation of any "Continuing Trust" under Article 2.2.A.(1) of the Trust remains premature and unauthorized.

. . .

5.       Contrary to your statement that "[t]he Trustee has a duty to follow the terms of the Trust which mandates the CPI adjustment," the trustee has no authority to establish the maintenance fund unless and until Skip specifically "elects to use [the Grafton/Springfield] real estate as his primary residence or as a vacation home." Moreover, Skip plainly has the power as a beneficiary, whether out of self-respect or basic reasonableness, to disclaim and/or waive the illogical, unfair and unreasonable adjustment to the already excessive base maintenance fund amount, which adjustment bears no relationship to the expenses of maintaining real property in rural New Hampshire, and instead reflects increases in costs for urban consumers, including groceries, rent, and medical care.[22]

Attorney Elise Salek, who was engaged to represent Skip individually, responded on

December 1:

The trust contains no formal process for making that election. Without opining as to the legitimacy of your position as set forth in paragraph 2 of your November 20th correspondence to Attorney Holmes, this letter shall serve as formal notice of [Skip's] election to use the Grafton/Springfield real estate as a vacation home. If and when my client should opt to occupy the property as his primary residence, that decision will be communicated to you.[23]

Attorney Gray argues that, in the October 11 letter, Attorney Holmes represented

that he "calculated the Maintenance Fund amount, based in part on the year of CLG's

death.  Like Richmond before him, Holmes confirmed the time of valuation of the

Maintenance Fund was based on [Chester's] date of death, and the Maintenance Fund

would be calculated without reference to anything in the preamble of Article 2.2. of the

---

[22] November 20 Letter (doc. no. 63) at 2-3.
[23] December 1 Letter (doc. no. 63-1) at 1.

CLG 2011 Trust Instrument."[24]  Attorney Gray adds that "Holmes also made representations in this letter upon which I relied" and that "I relied on these representations by Holmes."[25]

Attorney Gray's conclusory statement in his declaration that he relied on Attorney Holmes's statements without explaining how or in what manner is not sufficient to create a genuine dispute of material fact.  See Maiorana v. MacDonald, 596 F.2d 1072, 1080 (1st Cir. 1979) (holding that an affiant's conclusory language is insufficient to create a genuine dispute of fact at summary judgment).  Indeed, Attorney Gray's responses to the letter make it clear that he did not agree with Attorney Holmes's interpretation of the CLG Trust instrument's text, so it is apparent that he did not rely on these representations.

Further, Attorney Gray mischaracterizes Attorney Holmes's letter, which does not take a position about when the funding level for the purposes of the BJG Trust pour over is determined.  Attorney Gray incorrectly redirects Attorney Holmes's statement about how he calculated the inflation adjustment to the $820,000 threshold level into a statement about the operation of the pour-over provision in the BJG Trust.

In his briefs, Attorney Gray identifies no other relevant communications or evidence of communications in support of his equitable estoppel defense.  As such, Attorney Gray has failed to demonstrate a triable issue as to whether equitable estoppel

---

[24] Attorney Gray Decl. ¶ 53.
[25] Id.

17

applies to Count 2 of the CLG Estate Counterclaims. Attorney Gray's equitable estoppel defense as to Count 2 of the CLG Estate Counterclaims is without merit.

### b. Unclean hands (Sixth Defense)

As to the Sixth Defense, which Attorney Gray entitled "unclean hands," Attorney Gray contends that Skip cannot enforce Article 2.4.A of the BJG Trust because Chester procured Article 2.4.A of the BJG Trust through undue influence. "It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands." Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 880 (1st Cir. 1995). "[Courts of equity] apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245 (1933). "The doctrine of unclean hands only applies when the claimant's misconduct is directly related to the merits of the controversy between the parties, that is, when the tawdry acts 'in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.'" Texaco Puerto Rico, 60 F.3d at 867 (quoting Keystone Driller, 290 U.S. at 245).

Here, Attorney Gray has not shown evidence that Skip should be denied equitable relief because of an unconscionable or bad faith act by Chester. Even assuming that Skip's declaratory judgment claim can be tainted by Chester's actions, Attorney Gray has not provided evidence from which a reasonable jury could infer anything of significance

18

about the conscionability of Chester's actions at the time the trusts were amended and restated. At most, Attorney Gray shows that Chester primarily met with Attorney Harvey and that Barbara's health was poor at the time.

Attorney Gray points to Chester's statement to him that "I have decided" to put the Grafton property into the trust.[26] This statement, however, is not evidence that Chester improperly injected the pour-over provision into the BJG Trust. Chester's statement is consistent with his placement of the Grafton property into the CLG Trust. Since the CLG Trust was settled by Chester, he did not act inappropriately by placing the real estate into his trust. Therefore, Attorney Gray has not shown that there is a genuine dispute of any material fact as to his unclean hands defense.

### c.    Undue influence (Sixth Defense)

As discussed in the prior order on Skip's motion for partial summary judgment, Attorney Gray's Sixth Defense and the related argument in his opposition to Skip's motion for summary judgment could be construed to give rise to a trust contest under RSA 564-B:4-406(a). Attorney Gray's opposition states:

> One set of facts barring Defendant's counterclaim on the basis of unclean hands involves the undue influence by which [Chester] alone directed the terms of the 2011 BJG Trust Instrument, at a time when [Barbara] had long been in a debilitated state cognitively and physically, and was completely dependent upon [Chester] for her material existence.[27]

---

[26] Attorney Gray Decl. ¶ 23.
[27] Attorney Gray Opposition at 23.

19

"A trust is void to the extent . . . its creation was induced by fraud, duress, or undue influence." RSA 564-B:4-406(a). Undue influence is "force or coercion that alters the donor's will and must be more than the mere influence of affection." In re Estate of Cass, 143 N.H. 57, 61 (1998). If the party contesting the trust shows that the influencing party had a "confidential relationship" with the influenced party, the burden shifts to the influencing party to show the absence of undue influence. In re Stedman 1989 Trust 2013 Restatement, 2016 WL 7451406, at *1 (N.H. Nov. 10, 2016). A confidential relationship exists if the influenced party was "dependent" on the influencing party "for transportation, banking, and payment of bills." Id.

The court ordered supplemental briefing on the issue of whether a trust contest on undue influence grounds under RSA 564-B:4-406(a) may be pleaded as an affirmative defense or whether it must be pleaded as an independent claim for relief.

### i. Propriety of trust contest as affirmative defense

Attorney Gray argues in his supplemental brief that "undue influence" can be treated as an affirmative defense because it falls under Federal Rule of Civil Procedure 8(c)(1)'s residual clause. He references the language of RSA 564-B:4-406, which he argues "confirms that undue influence must be treated as an affirmative defense."[28] He argues that the "request for relief in the Answer requested dismissal and denial of the Counterclaims, not any affirmative relief."[29] Attorney Gray asserts that whether New

---

[28] Attorney Gray Supplemental Brief (doc. no. 75) at 5.
[29] Id. at 5-6.

20

Hampshire provides a cause of action to void a trust on the ground of undue influence is irrelevant to whether he can assert an affirmative defense of undue influence. He contends that he was entitled to wait until Skip brought a claim under the trust to assert undue influence as an affirmative defense.[30]

In response, Skip asserts that a finding by this court that Chester procured the BJG Trust by undue influence will render that trust void in its entirety. Skip argues that Attorney Gray's undue influence allegation is really a claim for declaratory relief. Skip contends that a declaratory judgment claim by Attorney Gray seeking to void the BJG Trust is futile because of the time bar contained in RSA 564-B:4-406(b) and because it is barred under the doctrine of estoppel.

Under the circumstances of this case, a trust contest on the ground of undue influence must be brought as an independent claim for affirmative relief, not an affirmative defense. "[A] request for relief that amounts to no more than denial of the plaintiff's demand is properly considered an answer, not a separate claim for affirmative relief . . . ." Akiachak Native Cmty. v. United States Dep't of Interior, 827 F.3d 100, 107-08 (D.C. Cir. 2016). But Attorney Gray's request that the court void parts of the BJG Trust on the ground of undue influence goes beyond merely answering and defeating Skip's claim about how the trust instrument's text should be interpreted. If

---

[30] Attorney Gray also raised an issue regarding whether the time bar of RSA 564-B:4-406(b) could be applied retroactively to the BJG Trust. Attorney Gray, however, conceded in his reply and at oral argument that retroactivity is not an issue because the statute was in force at the time the BJG Trust was executed in 2011. Attorney Gray Supplemental Reply (doc. no. 78) at 4-5.

21

Attorney Gray prevailed in the trust contest, the court would need to issue a decree reforming, rescinding, or otherwise modifying the BJG Trust, depending on the scope of the undue influence found. See Restatement (Third) of Trusts §§ 12, 62. Because Attorney Gray's undue influence defense necessarily implies a request for a decree reforming, modifying, or rescinding the BJG Trust, in whole or in part, it is a request for affirmative relief that goes beyond negating Skip's claim for a declaratory judgment interpreting the trust terms. As is apparent from Skip's briefing on this issue, there are several defenses to Attorney Gray's undue influence claim, such as RSA 564-B:4-406(b)'s time bar and estoppel,[31] that Skip was unable to raise because Attorney Gray pleaded the undue influence claim as an "unclean hands" defense. Therefore, Attorney Gray's trust contest cannot be brought as an affirmative defense and must be brought as an independent claim for relief.

Attorney Gray argues that his undue influence defense falls under Rule 8(c)'s residual clause pursuant to Wolf v. Reliance Standard Life Ins. Co., 71 F.3d 444, 449 (1st Cir. 1995), and Jakobsen v. Mass. Port Auth., 520 F.2d 810, 813 (1st Cir. 1975). Wolf and Jakobsen, however, refer to whether a defense must be stated in a responsive pleading, not whether a theory that requires affirmative relief beyond defeating an

---

[31] As to estoppel, Skip argues that Attorney Gray cannot proceed with a trust contest because he accepted the position of trustee. See Bogert's The Law of Trusts and Trustees § 581 (June 2019) ("The trustee has a duty not to attack the trust or set up a claim that it is in whole or in part invalid, or to maintain that its creation was procured in an illegal manner or for an illegal purpose.").

opposing claim may be pleaded as an affirmative defense rather than a counterclaim. The standards in Wolf and Jakobsen are not applicable to the issue before the court.

Finally, Attorney Gray contends that public policy dictates that he be able to raise issues about undue influence in response to Skip's declaratory judgment counterclaim regarding the meaning of the BJG Trust terms. While Attorney Gray is correct that RSA 564-B:4-406 creates a public policy against enforcing invalidly created trusts, the same statute articulates a public policy of finality regarding the validity of a trust by creating a limited time period during which interested parties can bring a trust contest. See RSA 564-B:4-406(b). Indeed, during the limited trust contest period, New Hampshire provides a safe harbor for trustees against liability, excepting them from the safe harbor if they "know[] of a pending judicial proceeding contesting the validity of the trust" or if they have been notified of a possible judicial proceeding to contest the trust. RSA 564-B:4-406(e). But the statute extends no similar safe harbor for distributing assets or otherwise enforcing the trust after the contest period expires, suggesting that trust contests are limited to the contest period. For those reasons, Attorney Gray's Sixth Defense to Skip's declaratory judgment counterclaim asserting undue influence is precluded as a matter of law.

### ii. Futility of counterclaim

Under Federal Rule of Civil Procedure 8(c)(2), the court must, if the interest of justice requires, treat a counterclaim incorrectly asserted as an affirmative defense as a counterclaim. At the request of the court, the parties briefed whether the interest of

23

justice would require the court to treat the undue influence defense as if it had been properly pleaded as a counterclaim. The court specifically identified whether a counterclaim would be futile because of RSA 564-B:4-406(b), which limits actions to void a trust on the ground of undue influence to three years after the settlor's death. Accordingly, the parties briefed whether the undue influence defense would be futile if converted to a claim because it is time barred under RSA 564-B:4-406(b). Skip argues that the trust contest is futile because it is time barred. Attorney Gray contends that RSA 564-B:4-406(b) does not apply.

Under RSA 564-B:4-406(b)(1), a person is barred from commencing a judicial proceeding to contest the validity of a trust that was revocable at the settlor's death if, inter alia, three years have passed since the settlor's death. Attorney Gray filed his Answer containing the undue influence counterclaim on June 6, 2019. The BJG Trust was revocable at the time of Barbara's death, and Barbara died on April 9, 2013. Therefore, Attorney Gray's undue influence claim was brought well outside the three-year time period for contesting the validity of a trust that was revocable at the settlor's death. See RSA 564-B:4-406(b)(1).[32] Attorney Gray argues that, by its text, RSA 564-B:4-406(b) does not apply to trust contests on the ground of undue influence. He is incorrect. See In re Beatrice C. Skillen 1995 Trust Agreement, No. 320-2018-EQ-74, at 4-5 (N.H. 6th Cir. Ct. Prob. Div., Trust Dckt., Aug. 22, 2018) (dismissing undue

---

[32] The parties contest whether RSA 564-B:4-406(b) is a statute of repose or statute of limitations. Whether the statute is one of repose or limitations is immaterial to this case. Read either way, the statute prevents Attorney Gray from asserting an undue influence claim.

influence claim because it was not timely filed under RSA 564-B:4-406(b)), aff'd, 2019 WL 4165179 (N.H. Aug. 15, 2019). Because any undue influence claim would be futile, the interests of justice do not require the court to recast Attorney Gray's improperly pleaded defense as a counterclaim.

### d. Other grounds

In his opposition to summary judgment, in his additional briefs, and at oral argument, Attorney Gray referenced grounds for his equitable defenses other than those already discussed. For example, Attorney Gray makes a vague assertion that the court cannot decide the merits of the unclean hands defense until the court resolves "every factual issue" raised by his claims—i.e., Counts 1 through 4 of the Amended Complaint—because those claims are also grounds for his unclean hands defense.[33] But beyond his conclusory declaration that a trialworthy issue exists, Attorney Gray has failed to identify any evidence or argument that there is a trialworthy issue regarding Skip's unclean hands based on "factual issues" in Counts 1 through 4. See Doherty v. Merck & Co., Inc., 892 F.3d 493, 500-01 (1st Cir. 2018) ("Such a skimpy effort to advance an issue . . . waives the issue."); United States v. Mottolo, 26 F.3d 261, 263-64 (1st Cir. 1994) ("At summary judgment on the issue of liability, unproffered affirmative defenses to liability normally are deemed abandoned. . . . At the very least, therefore,

---

[33] Attorney Gray Opposition at 3, 22 ("Defendant has not even mentioned the unclean hands defense, which involves all the facts underlying Plaintiff's fiduciary breach claims, as well as many other facts.").

[the defendant] would have been required to present developed argumentation and competent evidence" showing a triable issue about his affirmative defense.).

Similarly, Attorney Gray asserts that his equitable estoppel defense is based on "material fact concealments."[34]   The "material fact concealments" to which Attorney Gray refers are not identified or discussed in his briefs, but, rather, are only identified in his declaration.  Declarations and affidavits, however, are not secondary vehicles that can be used to develop arguments perfunctorily asserted in a brief.  Moreover, incorporating Attorney Gray's declaration into his opposition memorandum by reference would extend the memorandum beyond the 25-page limit or, if allowed, would defeat the limit's purpose by allowing its trivial circumvention.  See LR 7.1(a)(3) ("Except by prior leave of the court . . . no memorandum in support of, or in opposition to, a dispositive motion shall exceed twenty-five (25) pages.").

At the outset of his memorandum, Attorney Gray asserts that "[i]f [he] were to state all the material facts raised by Plaintiff's equitable defenses, as contemplated by Local Rule 56.1(b), Plaintiff would need at least 50 pages to state such facts alone."[35]   In addition, in footnote 1 of his memorandum, Attorney Gray states: "In the event the Court

---

[34] Id. at 25 ("Plaintiff's equitable estoppel defense also depends upon material fact concealments by Defendant.  Plaintiff's understanding and reliance on these statements is set forth [in his declaration] at Paragraphs 51 to 54 and Exhibits 38 and 39.").  During oral argument, Attorney Gray argued that Skip's failure to timely provide a "vacancy report" was a ground for his equitable estoppel defense.  The court requested that Attorney Gray identify where in his briefs he raised that argument, and Attorney Gray identified the above-cited portion of his opposition memorandum.  Attorney Gray Supplemental Statement (doc. no. 100) at 1.

[35] Attorney Gray Opposition at 3.

were to conclude that the more limited statement set forth herein does not raise enough material facts to defeat summary judgment, Plaintiff respectfully requests the opportunity to supplement Plaintiff's statement with the full statement of facts supporting Plaintiff's equitable defenses." Attorney Gray has had ample opportunity to present his defenses along with their relevant facts in a concise and timely manner. The court declines his request for an opportunity to file an additional opposition memorandum.

e.      **Interpretation of BJG Trust pour-over provision**

Lastly, the court turns to the merits of Count 2 of the CLG Estate Counterclaims. As to this counterclaim, the dispute between Skip and Attorney Gray is about when the amount of a pour over under Article 2.4.A of the BJG Trust is determined. Skip contends that the only reasonable interpretation of Article 2.4.A is that a deficiency in the maintenance fund is to be determined after the death of Chester and Barbara and after all obligations of the CLG Trust have been paid, including any costs or damages paid out because of the lawsuit currently before the court. In other words, Skip argues that if Attorney Gray recovers from the CLG Trust on behalf of the BJG Trust, the BJG Trust must repay that money to the CLG Trust to the extent it creates a shortfall in the maintenance fund.

Attorney Gray disagrees, arguing that, under the language of the trusts, whether there is a deficiency in the CLG Trust for funding the maintenance fund was determined on the date of Chester's death. Therefore, Attorney Gray contends, if he prevails on his

27

claims and recovers against the CLG Trust assets, the BJG Trust is not obligated to repay the CLG Trust for any resulting shortfall in the maintenance fund.

"The interpretation of a trust is a question of law." Hodges v. Johnson, 170 N.H. 470, 480 (2017) (quoting In re Pack Monadnock, 147 N.H. 419, 423 (2002)). In interpreting language used in a trust, as in any written instrument, the court gives words and phrases their common meaning and examines "the instrument as a whole." Hodges, 170 N.H. at 481.

When the court construes a trust instrument, "the intention of a settlor is paramount, and [the court] determine[s] that intent, whenever possible, from the express terms of the trust itself." Appeal of Lowry, 156 N.H. 57, 61 (2007). So long as the text of the trust is unambiguous, "extrinsic evidence may not be used to vary or contradict the express terms of the trust." In re Pack Monadnock, 147 N.H. at 423; see also Restatement (Third) of Trusts § 4 (2003). Language in a written instrument is ambiguous only if the parties reasonably disagree about its meaning. Signal Aviation Servs. v. City of Lebanon, 169 N.H. 162, 166 (2016).

The unambiguous terms of the CLG Trust and the BJG Trust resolve the dispute between Skip and Attorney Gray about the operation of Article 2.4.A of the BJG Trust. As noted above, the CLG Trust establishes a "Continuing Trust for Real Estate Located in Grafton and Springfield, New Hampshire."[36] The Continuing Trust would include the

---

[36] Art. 2.2.A, CLG Trust at 3.

28

real estate and a maintenance fund of at least $820,000, constituted by the liquid assets in the Continuing Trust.[37]

Under the terms of the CLG Trust, the Continuing Trust, with the maintenance fund, is to be established after Chester's death and "after paying or making provision for all death taxes, administrative expenses and other obligations."[38] Because Chester's estate is not yet resolved, the administrative expenses and other obligations of the CLG Trust have not been paid and cannot yet be provided for, and the maintenance fund in the Continuing Trust has not yet been, and cannot yet be, established. See RSA 564-B:5-505(b)(1) (stating that a trust that was revocable immediately before the settlor's death is subject to claims of the settlor's creditors if the settlor's probate estate is inadequate to satisfy the claims).[39]

Article 2.4.A of the BJG Trust mandates that assets be distributed from (i.e., poured over to) the BJG Trust to the Continuing Trust if the Continuing Trust has insufficient liquid assets to meet the $820,000 (adjusted for inflation) threshold. Article 2.4.A sets out how to determine whether a pour over occurs as follows:

> If at the time of the death of my husband and myself, the amount of liquid assets held in the continuing trust for real estate located in Grafton and Springfield, New Hampshire as set forth in my husband's trust is less than the sum of [$820,000 adjusted for inflation], I direct that my trustee distribute from my trust an amount of property that will increase the sums

---

[37] Art. 2.2.A(1), id.

[38] Art. 2.2, id. at 2.

[39] See also Amended Compl. (doc. no. 9) ¶ 46 ("[T]he property of the CLG Trust is subject to the claims of [Attorney Gray] against [Chester] . . . ."); Attorney Gray Demand Letter (doc. no. 62-8) at 2 (letter from Attorney Gray notifying Skip that, under Article 2.2 of the CLG Trust, Attorney Gray's claims are "debts of the deceased" and "obligations that must be paid before" the Continuing Trust can be established).

held in said continuing trust of my husband's to the sum of [$820,000 adjusted for inflation].[40]

As noted, the Continuing Trust is not created until "all death taxes, administrative expenses, and other obligations" of the CLG Trust are paid or provided for.[41]  It would make little sense to determine, under Article 2.4.A of the BJG Trust, "the amount of liquid assets held in the continuing trust" before the Continuing Trust is or can be created. Therefore, Attorney Gray's argument that the amount of the pour over was determined at the moment Chester died is inconsistent with the language of Article 2.2 of the CLG Trust and Article 2.4.A of the BJG Trust.  His interpretation incorrectly presupposes that the Continuing Trust and maintenance fund could be established at the moment Chester died.  Under the trusts' terms that could not have happened.  Instead, the pour-over amount, if any, is determined only after the Continuing Trust and maintenance fund have been created and initially funded from the assets remaining in the CLG Trust after it has paid or made provision for[42] all "death taxes, administrative expenses and other obligations" of the trust.

Attorney Gray contends that the language of the CLG Trust is irrelevant to the pour-over provision in the BJG Trust, the meaning of which Attorney Gray contends is

---

[40] BJG Trust at 4.

[41] Art. 2.2, CLG Trust at 2.

[42] In this context, making "provision for" (Art. 2.2 of the CLG Trust) means earmarking assets of the trust for the purpose of paying "death taxes," administrative expenses, or other obligations of the trust.  Naturally, assets earmarked for these purposes, even though they may still be temporarily within the trustee's control, cannot be used to setup the Continuing Trust and maintenance fund and are not part of the determination of funds available for such Continuing Trust and maintenance fund.

determined by Barbara's intent, not Chester's intent. Attorney Gray doubts that Barbara intended to withhold distributions under the BJG Trust until after payment of administrative expenses of the CLG Trust. Yet, in the BJG Trust, Barbara linked her trust to the CLG Trust, as her trust provides for the post-death disposition of her assets by requiring, as necessary, a pour over of funds to the "continuing trust for real estate located in Grafton and Springfield, New Hampshire as set forth in [Chester's] trust."[43] As noted above, the Continuing Trust and maintenance fund are not created until after the payment of, or making provision for, the CLG Trust obligations. Therefore, Attorney Gray's argument that the BJG Trust and CLG Trust are unrelated ignores the plain language of Article 2.4.A of the BJG Trust, which links the BJG Trust to the CLG Trust.

Next, Attorney Gray argues that, if the BJG Trust is read to measure the amount of a pour over only after all the "administrative expenses and other obligations" of the CLG Trust have been paid, there can be no distribution of the BJG Trust assets so long as the Continuing Trust exists, because the Continuing Trust will incur yearly administrative expenses. Attorney Gray argues that this result is absurd, making Skip's interpretation invalid.

Attorney Gray misconstrues Article 2.2 of the CLG Trust. Once the expenses and other obligations of the CLG Trust are paid and the Continuing Trust is established and funded, the trustees can, consistent with the terms of the trusts, proceed to distribute the

---

[43] Art. 2.4.A, BJG Trust at 4.

remaining assets of the CLG Trust and BJG Trust to the residual beneficiaries pursuant to Article 2.4 of the BJG Trust and Article 2.2.B of the CLG Trust.

For the foregoing reasons and for the purpose of Article 2.4.A of the BJG Trust, the "amount of liquid assets held in the continuing trust" is measured at the time that the Continuing Trust can be and is legally created under the terms of the CLG Trust, which is after "all death taxes, administrative expenses and other obligations" of the CLG Trust have been paid or provided for.[44] The court will enter a declaratory judgment to that effect, resolving the substantial controversy between the parties relative to Count 2 of the CLG Estate Counterclaims.

## IV.     Conclusion

For the foregoing reasons, Skip's motion for partial summary judgment (doc. no. 62) is GRANTED.  Summary judgment is GRANTED in favor of Skip as to Count 2 of the CLG Estate Counterclaims.  The court DECLARES the following:

> The Continuing Trust and maintenance fund set out in Article 2.2.A of the First Amendment and Complete Restatement of the Chester L. Gray, Jr. Trust of 1996 ("CLG Trust") cannot be created "until all death taxes, administrative expenses and other obligations" of the CLG Trust are paid or provided for.
>
> Article 2.4.A of the First Amendment and Complete Restatement of the Barbara J. Gray Trust of 1996 ("BJG Trust") requires its trustees to distribute property of the BJG Trust to the Continuing Trust if "the amount of liquid assets held in the continuing trust" is less than $820,000, adjusted in accordance with the percentage changes in the Consumer Price Index – All Urban Consumers (Northeast Region) from January 1, 2011, until January 1 of the year of Barbara Gray's death (the "Minimum Funding

---

[44] See CLG Trust at 2.

Level"). Property is to be distributed from the BJG Trust until the value of the liquid assets of the Continuing Trust is the Minimum Funding Level.

"[T]he amount of liquid assets held in the continuing trust" refers to the amount of liquid assets held in the Continuing Trust when it is and can be established, which can only occur after "all death taxes, administrative expenses and other obligations" of the CLG Trust have been paid or provided for.

Therefore, whether such Continuing Trust and its maintenance fund have the requisite level of funding for purposes of Article 2.4.A of the BJG Trust is not yet determined and cannot be determined until all death taxes, administrative expenses and other obligations of the CLG Trust are paid or provided for. Once such expenses are paid or provided for, the Continuing Trust and maintenance fund can be established, and the trustees of the BJG Trust can, after the Continuing Trust is established, determine the amount of any necessary property distribution from the BJG Trust to the Continuing Trust based on the liquid assets of the Continuing Trust when it is established.

Counts 1 through 4 of Attorney Gray's Amended Complaint remain as the only substantive claims left for the court's adjudication at trial. The BJG Trust Counterclaims and Count 1 of the CLG Estate Counterclaims, which seek attorneys' fees/reimbursement also remain for adjudication, but are more appropriately addressed after the merits issues of Attorney Gray's Amended Complaint are decided.

  **SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

July 20, 2020
cc: Evan W. Gray, pro se
  Ralph F. Holmes, Esq.
  Adam M. Hamel, Esq.
  Andrea Jo Schweitzer, Esq.
  Roy S. McCandless, Esq.
  Neil B. Nicholson, Esq.
  Bradley M. Lown, Esq.

33